UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GLORIA CAVALUZZI *et al*,

                              Plaintiffs,

                    -v-

COUNTY OF SULLIVAN,

                              Defendant.

---

23 Civ. 11067 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

In *Tyler v. Hennepin County*, 598 U.S. 631 (2023), the Supreme Court held that a county could be liable for taking private property without just compensation, in violation of the Takings Clause of the Fifth Amendment of the Constitution, where, after foreclosing on and selling a taxpayer's real property in order to extinguish her property tax debt, it kept for itself the excess proceeds of the sale. The instant case, based on and brought shortly after the *Tyler* decision, involves similar claims by 25 residents of New York's Sullivan County (the "County"). They claim that the County violated the Takings Clause, by retaining the proceeds of tax foreclosure sales in excess of the sum necessary to pay the outstanding property taxes, interest, and penalties. Based on the same conduct, plaintiffs also claim violations of the Excessive Fines Clause of the Eighth Amendment and, separately, of New York State law.

The County now moves to dismiss plaintiffs' Amended Complaint ("AC") for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, to dismiss it, in part, for failure to state a claim under Rule 12(b)(6). For the reasons that follow, the Court denies the motions.

## I.    Background[1]

### A.    Factual Background

#### 1.    New York's Statutory Scheme Prior to *Tyler*

New York counties assess taxes on property every year, in accordance with the New York State Real Property Tax Law.  *See* N.Y. Real Prop. Tax Law §§ 900 *et seq.*  The taxpayer has one year to pay before the taxes become delinquent.  *Id.* §§ 902, 1102(4).  A municipality may enforce the payment of a delinquent tax by placing a tax lien on the affected property.  *Id.* §§ 1102(3), 1104.  If the taxpayer does not pay within the first month after the lien date, the tax accrues interest and penalties.  *Id.* § 924.  Generally, the delinquent taxpayer has two years to redeem the property and regain title by paying all outstanding taxes, fees, and penalties.  *Id.* § 1110.  If, however, the taxpayer does not satisfy the amount due, absolute title vests in the State, and the tax debt is extinguished.  *Id.* § 1136(3).  The State may keep the property for public use or sell it to a private party.  *Id.* § 1190.

As of the *Tyler* decision in 2023, Article 11 of New York State's Real Property Tax Law authorized the taxing authorities to retain the surplus proceeds from the sales of tax delinquent properties.  *See id.* §§ 1190, 1194.

#### 2.    The *Tyler* Decision

The Supreme Court's unanimous decision in *Tyler* issued on May 25, 2023.  Plaintiff Geraldine Tyler owned a condominium in Hennepin County, Minnesota, on which $15,000 in unpaid property taxes, interest, and penalties, had accumulated.  *Tyler*, 598 U.S. at 635.  The

---

[1] The following account is drawn from the AC, Dkt. 24, and the parties' submissions on the County's pending motions.  These include the County's memorandum of law, Dkt. 27 ("Def. Br."); and Thomas J. Cawley's declaration, Dkt. 26 ("Cawley Decl."), in support of the County's motion; plaintiffs' opposition and exhibits thereto, Dkt. 32 ("Pls. Br."); David M. Giglio's declaration in support of plaintiffs' opposition, Dkt. 32-1 ("Giglio Decl."); the County's reply, Dkt. 33 ("Def. Reply"); and plaintiffs' sur-reply, Dkt. 36 ("Pls. Sur-reply").

County, acting under Minnesota's forfeiture procedures, seized Hennepin's condominium and sold it for $40,000, extinguishing her outstanding debt. *Id.* Rather than return the remaining $25,000, the County kept the surplus for its own use. *Id.* Tyler filed a putative class action against the County and its officials. *Id.* She claimed that, in retaining the surplus, the County had violated the Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, and the Excessive Fines Clause of the Eighth Amendment. *Id.* at 635–36.

Ruling on Tyler's takings claim, the Supreme Court unanimously held that a county cannot retain surplus money from the sale of foreclosed property to satisfy a delinquent property tax debt, without providing the taxpayer an opportunity for recovery of the surplus. *Id.* at 639–40. Doing so, the Court held, effected a "classic taking in which the government directly appropriates private property for its own use" without just compensation. *Id.* at 639 (citation omitted). The Court recognized that Hennepin County had "had the power to sell Tyler's home to recover the unpaid property taxes." *Id.* at 639. But, it held, the County "could not use the toehold of the tax debt to confiscate more property than was due." *Id.* at 639. The Takings Clause, it explained, "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Id.* at 647 (citation omitted). And a taxpayer "must render unto Caesar what is Caesar's, but no more." *Id.* at 647. The Court emphasized, however, that where state law "simply defin[es] the process through which the owner could claim the surplus," such would not offend the Takings Clause, because the State had made available a means to secure just compensation. *Id.* at 644 (citing *Nelson v. City of New York*, 352 U.S. 103, 109–11 (1956)). Minnesota law, however, lacked any such mechanism for recovery. *Id.* at 644–45.

The Court's majority did not reach Tyler's Excessive Fines claim.  *Id.* at 647–48.  In a concurring opinion, however, Justice Gorsuch, joined by Justice Jackson, suggested that Tyler might separately have a viable such claim, to the extent that Minnesota's tax foreclosure scheme produced fines that were partly punitive in nature.  *Id.* at 648–50 (Gorsuch, J., concurring).

### 3.    *Tyler*'s Aftermath in General

As the Supreme Court recognized in *Tyler*, numerous States at the time, like Minnesota, did not provide "opportunit[ies] for the taxpayer to recover the excess value" from the State following delinquent property sales.  *Id.* at 644.  After *Tyler*, courts invalidated aspects of the tax foreclosure schemes of several States for failing to provide mechanisms by which the taxpayer could pursue just compensation.  *See, e.g.*, *257-261 20th Ave. Realty, LLC v. Roberto*, 477 N.J. Super. 339, 362 (App. Div. 2023) (holding that because New Jersey's Tax Sale Law, N.J.S.A. 54:5-1 *et seq.*, "d[id] not contemplate compensation to a property owner where the property value exceed[ed] the amount owed to a taxing authority," it "permitted foreclosure of a property owner's equity" and "thus [effected] a prohibited taking after *Tyler*"); *Sharritt v. Henry*, 23 Civ. 15838, 2024 WL 4524501, at *13 (N.D. Ill. Oct. 18, 2024) (holding that the mechanism in the Illinois Tax Code for post-deprivation relief, 35 Ill. Comp. Stat. 200 *et seq.*, was "deficient as a mechanism to satisfy the Fifth Amendment," because it did not provide for "certain and full compensation").  Other States have since modified their statutory schemes.  Massachusetts and Michigan, for example, created statutory procedures for property owners to reclaim excess proceeds after tax foreclosure sales.  *See* Mass. Gen. Laws, ch. 60; Mich. Comp. Laws Ann. § 211.78l.[2]  In other States, the existing framework has been upheld as consistent with *Tyler*.  *See,*

---

[2] Massachusetts's revised scheme has been upheld by at least one district court.  *See, e.g.*, *Davenport v. Town of Reading*, No. 22 Civ. 12239, 2024 WL 4495105, at *2 n.5 (D. Mass. Oct. 15, 2024) ("[T]he Massachusetts Legislature answered [*Tyler*'s] call to rewrite the statute. Presumably, if property owners could have obtained relief through Chapter 79, § 10, the

*e.g.*, *FIG v. Lynch*, 2024 Ohio 3196, 2024 WL 3893649, at *6, *appeal denied*, 176 Ohio St. 3d 1409 (2024) (upholding Ohio framework under which "the homeowner retains the right to any surplus beyond the obligations owed" and which thus "aligns with the procedural fairness principle endorsed in *Tyler*" (citation omitted)); *Biesemeyer v. Mun. of Anchorage, Alaska*, No. 23 Civ. 185, 2024 WL 1480564, at *7 (D. Alaska Mar. 13, 2024) (upholding Alaska law, which "grants property owners six months to claim the surplus from a tax-foreclosure sale," as compliant with *Tyler*).

### 4. New York's Post-*Tyler* Amendment of Article 11

On April 23, 2024, New York Governor Kathy Hochul signed into law an amendment to Article 11 of the New York State Real Property Tax Law. 2024 N.Y. Sess. Laws ch. 55, pt. BB. It puts in place a process by which an owner can claim and pursue a surplus from a sale of a tax-foreclosed property. *Id.* Specifically, it provides:

> Any person who had any right, title, interest, claim, lien or equity of redemption in or upon a parcel immediately prior to the issuance of the judgment of foreclosure may file a claim with the court having jurisdiction for a share of any surplus resulting from the sale of such property. Such claims shall be administered and adjudicated, and such surplus shall be distributed, in the same manner as in an action to foreclose a mortgage pursuant to [A]rticle [13] of the real property actions and proceedings law, subject to the provisions of this section.

*Id.* § 15 (adding N.Y. Real Prop. Tax Law § 1197).[3] However, when the foreclosure concerns residential property, "if at the time of the confirmation of the report of sale, no former

---

Legislature would not have felt the need to enact such extensive legislation."). The scheme that Michigan amended had been held violative of the Takings Clause several years before *Tyler*. *See Rafaeli, LLC v. Oakland Cnty.*, 505 Mich. 429, 474–75 (2020) (unanimously holding that retention of surplus proceeds from tax foreclosures pursuant to the then-controlling version of Michigan's General Property Tax Act was an unconstitutional taking).

[3] Under Article 13, "[a]ny person claiming the surplus moneys arising upon the sale of mortgaged premises, . . . at any time *before* the confirmation of the report of sale, may file with the clerk in whose office the report of sale is filed, a written notice of such claim, stating the nature and extent of his claim and [his] address." N.Y. Real Prop. Acts. Law § 1361 (emphasis

homeowner has filed a claim for surplus, and there are surplus proceeds that remain to be distributed, the proceeding shall remain open for at least three years[.]" *Id.* After this period, any unclaimed surplus funds "shall be deemed abandoned" and "shall be paid to the tax district . . . to reduce its tax levy." *Id.*

Salient here, by its terms, the amendment has limited retroactive application. In general, it applies only to sales of tax-foreclosed property "on or after May 25, 2023," the date the Supreme Court decided *Tyler*. *Id.* § 19; *see also In re Seelbach*, 218 N.Y.S.3d 200, 213 (N.Y. Sup. Ct. 2024) ("[T]he Legislature made Part BB retroactive to *Tyler*'s 2023 decision date (*see* L 2024, ch 55, pt BB, § 19)—potent if not conclusive proof that the Legislature intended Part BB to cure the RPTL Article 11 system's legal uncertainty under *Tyler*." (citation omitted)). For properties sold before May 25, 2023, a taxpayer may pursue a claim for the surplus on such sale only if he or she had timely initiated a proceeding to compel the "tax district to distribute such surplus" pursuant to Article 78 of the New York Civil Practice Law and Rules, and if that proceeding remained active as of April 20, 2024. 2024 N.Y. Sess. Laws ch. 55, pt. BB § 19. Article 78 provides a mechanism to challenge as unlawful a decision by a New York State official or administrative agency. *See* N.Y. C.P.L.R. 7803(1).

**B.    This Litigation**

Plaintiffs are a group of 25 owners of properties in Sullivan County who failed to pay local property taxes and penalties. AC ¶¶ 21–57. Their tax debts ranged from $250, *id.* ¶ 28, to $100,000, *id.* ¶ 32, with an average deficiency of approximately $12,600. The County foreclosed on their properties, and sold these at tax auctions between July 16, 2019, and February 2, 2023,

---

added). Within three months of a motion for confirmation, the court "shall ascertain and report the amount due to him or any other person who has a lien on such surplus moneys, and the priority of the several liens thereon and order distribution of surplus moneys." *Id.*

*i.e.*, before May 25, 2023.  *Id.* ¶¶ 21–57.[4]  These sales generally occurred between five and 10

months after the County Treasurer had issued a treasurer's deed as to the property.[5]  *See, e.g.*, *id.*

¶¶ 23, 29, 177–78.  In each case, the properties sold for an amount exceeding the plaintiff's tax

debt, with the resulting surpluses ranging from $5,750, *id.* ¶¶ 27–28, to $250,000, *id.* ¶ 31–32,

and an average surplus of $51,000.  The County retained, and to date has not returned, the excess

funds.  *See id.* ¶ 51.

On December 5, 2023, plaintiffs sued the County and Nancy Buck, in her official

capacity as its treasurer, in the United States District Court for the Northern District of New

York.  Dkt. 1.  Plaintiffs brought claims under 42 U.S.C. § 1983, contending that the County's

retention of the surplus from the tax foreclosure sales violated the Takings and Excessive Fine

Clauses.  *Id.*  They also brought state law claims of unjust enrichment and breach of fiduciary

duty.  *Id.*

On December 8, 2023, the Hon. Frederick J. Scullin, finding that the parties reside, and

all relevant events occurred, in this District, issued an order directing to transfer the case to this

District.  Dkt. 2.  On December 21, 2023, the case was transferred to this Court.  Dkt. 3.

On March 8, 2024, defendants filed a motion to dismiss, a declaration, and a supporting

memorandum of law.  Dkts. 18–20.  On March 11, 2024, the Court issued an order directing

plaintiffs either to amend their complaint or oppose the motion to dismiss.  Dkt. 21.  On

---

[4] With one exception:  the AC originally included claims by plaintiffs Randy and Elizabeth
Kleingardner, whose property was sold at a tax-foreclosure auction on or about September 27,
2023, that is, after the effective date of New York's post-*Tyler* amendment to Article 11.  *Id.*
¶ 39.  On September 17, 2024, the Kleingardners voluntarily dismissed their claims in this action
to instead pursue remedies that the amended Article 11 made available.  *See* Dkts. 51–52.

[5] Also with one exception:  The County sold plaintiff Harvey Edelglass's property—for
$350,000, yielding a surplus of $250,000 above his $100,000 tax debt—approximately 14
months after the County Treasurer issued a treasurer's deed.  AC ¶¶ 31–32, 177.

March 28, 2024, plaintiffs filed the AC, removing Buck as a defendant.  Dkt. 22; *see* Dkt. 24.

On April 18, 2024, the County filed a motion to dismiss the AC, Dkt. 25, a supporting

memorandum of law, Dkt. 27, and a declaration, Dkt. 26.  On May 22, 2024, plaintiffs filed an

opposition, Dkt. 32, a declaration, Dkt. 32-1, and annexed exhibits.  On May 29, 2024, the

County replied.  Dkt. 33.  On June 14, 2024, plaintiffs filed a sur-reply.  Dkt. 36.

## II.    The County's Motion to Dismiss for Lack of Subject Matter Jurisdiction

The Court first considers the County's arguments under Rule 12(b)(1): principally, that

(1) plaintiffs' claims were not ripe for adjudication at the time the AC was filed; and (2) New

York's amendment of Article 11 to create a statutory remedy for taxpayers to reclaim surplus

funds has mooted their claims.  Neither argument is persuasive.

### A.    Applicable Legal Standards

A claim is "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v.

United States*, 201 F.3d 110, 113 (2d Cir. 2000).  A court lacks constitutional authority to

adjudicate a claim that is unripe because "[r]ipeness is a jurisdictional inquiry."  *Murphy v. New

Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005).  Similarly, a court lacks jurisdiction

to hear claims that ensuing events have rendered moot.  *See North Carolina v. Rice*, 404 U.S.

244, 246 (1971) (per curiam) ("Mootness is a jurisdictional question because the Court is not

empowered to decide moot questions or abstract propositions[.]" (citation omitted)).

"The burden of proving jurisdiction is on the party asserting it."  *Daly v. Citigroup Inc.*,

939 F.3d 415, 425 (2d Cir. 2019) (quoting *Robinson v. Overseas Military Sales Corp.*, 21 F.3d

502, 507 (2d Cir. 1994)).  Plaintiffs may rely "solely on the pleadings and supporting affidavits,"

and, although a court "will not draw 'argumentative inferences' in the plaintiff's favor," it is to

"construe jurisdictional allegations liberally and take as true uncontroverted factual allegations." *Robinson*, 21 F.3d at 507 (citation omitted).

### B.    Discussion

Measured against these standards, the Court may exercise jurisdiction over plaintiffs' claims, which are clearly both ripe and not moot.

#### 1.    Takings Clause Claims

"[A] property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it." *Knick v. Twp. of Scott*, 588 U.S. 180, 189 (2019). When a plaintiff claims such a violation, "a federal court should not consider the claim before the government has reached a 'final' decision" with respect to the action claimed to be a taking. *Pakdel v. City & Cnty. of San Francisco*, 594 U.S. 474, 475 (2021). To make the "relatively modest" showing necessary to show finality, the plaintiff need only demonstrate that "there [is] no question . . . about how the 'regulations at issue apply to the particular land in question.'" *Id.* at 478 (quoting *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 739 (1997)).

The County's first argument is that the Court lacked subject matter jurisdiction over plaintiffs' claims because, at the time the AC was filed, the New York Legislature had not yet amended New York's property laws to bring them into conformity with *Tyler*. This notion—that the legislature's inaction to that point made plaintiffs' claims unripe—is extravagantly wrong. As *Tyler* held, "a taxpayer is entitled to the surplus in excess of the debt owed," and a county's retention of that surplus violates the Takings Clause where the State's legislative scheme "provides no opportunity for the taxpayer to recover the excess value." 598 U.S. at 642, 644. The Supreme Court explained that, although a State could sell a taxpayer's home to recover unpaid property taxes, "it could not use the toehold of the tax debt to confiscate more property

than was due." *Id.* at 639.  "[D]oing so," it held, "effected a 'classic taking in which the government directly appropriate[d] private property for its own use.'" *Id.* at 639 (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 324 (2002)).  The Court held that a plaintiff alleging a county's appropriation of the surplus, without a remedy to recover it, pled "a classic pocketbook injury" that satisfied Article III standing.  *Id.* at 636.[6]

Plaintiffs' claims against the County, at the time brought, were on all fours with those in *Tyler*.  Much as Tyler lacked a mechanism under Minnesota law to recover the surplus from Hennepin County, plaintiffs here, before the amendment to Article 11, lacked a mechanism under New York law to recover the surplus above the tax debt.  The absence of that mechanism made the retention by a county of the surplus from a tax foreclosure sale a taking under *Tyler*—a point the County does not dispute.  And the AC alleges that, when plaintiffs demanded the return of surplus, the County refused.  *See, e.g.*, AC ¶ 51 ("On September 28, 2023, [135 Bowery] by and through their attorney demanded that the County of Sullivan return the surplus funds from the tax sale within 30 days from the date of the letter.  Said surplus funds were not returned.").  Nothing more was required to state a takings claim.  As in *Tyler*, plaintiffs' AC plausibly pleads "that [they] suffered financial harm from the County's action, and that is enough for now."  598 U.S. at 637.  No doctrine required a plaintiff to wait, let alone indefinitely, before filing her claim to see whether, and if so when, New York State would bring its statutory scheme into conformity

---

[6] In the context presented here, "the Article III standing and ripeness issues . . . 'boil down to the same question,'" whether plaintiff has suffered an actual concrete injury caused by State action and redressable in court.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007)); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006); *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) ("[T]o say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent,' but instead 'conjectural or hypothetical.'" (citation omitted)).

with *Tyler*.  *Cf.* 598 U.S. at 636–37 (holding that Tyler had standing to pursue takings claim before Minnesota later amended its property forfeiture laws); *Yakus v. United States*, 321 U.S. 414, 444 (1944) ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.").

To be sure, for a takings claim of this nature to be ripe, a plaintiff must allege a sale of his or her property, as opposed to a potential or contemplated sale.  *See, e.g.*, *Ramsey v. City of Newburgh*, No. 23 Civ. 8599, 2024 WL 4444374, at *3 (S.D.N.Y. Oct. 8, 2024) ("As the City has not sold the property, Plaintiff's takings claim is not ripe." (collecting cases)); *cf. Miner v. Clinton Cnty.*, N.Y., 541 F.3d 464, 475 n.7 (2d Cir. 2008) (where takings claim challenged sale of a property but there was "no indication that a sale has occurred or is imminent," plaintiffs "likely" lacked standing).  But the AC pleads, with specificity as to each of the 25 plaintiffs, that the County in fact sold their property and retained the excess value above their tax debts.  *See* AC ¶¶ 21–57.  Plaintiffs' claims were therefore ripe for adjudication at the time plaintiffs filed the AC.

The County's second argument is that the amendment of Article 11 moots the takings claims here by creating a mechanism that a taxpayer may use to pursue recovery of the tax-foreclosure surplus.  That, too, is wrong as to these plaintiffs, because the mechanism created by Article 11, as pled, is unavailable to them.  As amended, Article 11 does not permit taxpayers to pursue surplus claims where the tax-foreclosed properties were sold before May 25, 2023, unless the taxpayer had timely initiated an Article 78 lawsuit seeking just compensation that was still pending as of April 20, 2024.  2024 N.Y. Sess. Laws ch. 55, pt. BB § 19.  The AC pleads that

property of each remaining plaintiff was sold before May 25, 2023. *See* AC ¶¶ 21-57.[7]  And no party—neither plaintiffs nor the County—has claimed that any plaintiff ever pursued a lawsuit under Article 78, let alone that such a suit was pending as of when the amendment to Article 11 took effect.  And the County acknowledges that plaintiffs are ineligible for relief under amended Article 11.  Def. Reply at 2.  Because the amendment has not put in place a mechanism for surplus recovery that is available to plaintiffs, the County's claim that this amendment moots their claims does not logically follow.  *See, e.g.*, *Moore v. Harper*, 600 U.S. 1, 18–19 (2023) (case was not moot because dismissal "would foreclose the one path to full relief available to the [] defendants"); *Ne. Fla. Chap. of the Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 661–62 (1993) (controversy was not moot because changes to law were alleged to inflict the same injuries, albeit to a lesser extent); *Polizzi v. Cnty. of Schoharie*, 720 F. Supp. 3d 141, 151 (N.D.N.Y. 2024) (declining to dismiss takings claims because amended Article 11 did not clearly "provide[] plaintiffs a meaningful opportunity to recover the surplus equity in a manner consistent with both *Nelson* and *Tyler*").

The County's brief appears to separately fault plaintiffs for bringing their takings claim in federal court before pursuing—however futilely—relief under amended Article 11 or otherwise bringing a state-court lawsuit for just compensation such as under Article 78.  Def. Reply at 2.  That argument is foreclosed by *Knick v. Township of Scott*, *supra*.  There, the Supreme Court overruled the requirement of state-court exhaustion announced in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194–95 (1985).  That requirement, the Court held, "imposes an unjustifiable burden on takings plaintiffs, [and]

---

[7] Two original plaintiffs, Randy and Elizabeth Kleingardner, brought claims based on a foreclosure sale after May 25, 2023, but they have since dismissed their claims in favor of pursuing recovery of the surplus under Article 11 as amended. *See supra* note 4.

conflicts with the rest of our takings jurisprudence[.]"  588 U.S. at 185.  Although the presence

of a means "to obtain compensation after the fact" could vitiate a takings claim, the Court held,

"the property owner has suffered a violation of his Fifth Amendment rights when the government

takes his property without just compensation, and therefore may bring his claim in federal court

under § 1983" without first pursuing remedies in state court.  *Id.*; *see also Pakdel*, 594 U.S. at

475 (remanding in light of *Knick*; Ninth Circuit had wrongly required petitioner to exhaust state

procedures before pursuing § 1983 claim in federal court) (per curiam); *Buck Grp., LLC v. Cnty.

of Oneida*, No. 24 Civ. 70, 2024 WL 4710707, at *6–7 (N.D.N.Y. Nov. 7, 2024) (denying

motion to dismiss as to ripe takings claim; under *Knick*, plaintiff no longer had to first exhaust

New York procedures).

   In a final argument made under Rule 12(b)(1), the County argues that *Tyler* does not

apply retroactively to § 1983 claims based on the retention of surplus from property sales before

May 25, 2023, the day *Tyler* issued.  Def. Reply at 2–3.  Properly viewed, that is not a

jurisdictional challenge, but a challenge properly addressed under Rule 12(b)(6), which requires

that a complaint plausibly plead a right to relief.  *See infra* Part III.A.  Regardless, the County is

wrong.  When the Supreme Court "applies a rule of federal law to the parties before it, that rule

is the controlling interpretation of federal law and must be given full retroactive effect in all

cases still open on direct review *and as to all events, regardless of whether such events predate

or postdate [the Court's] announcement of the rule*."  *Harper v. Va. Dep't of Tax'n*, 509 U.S 86,

97 (1993) (emphasis added).  Consistent with this principle, the Supreme Court has remanded

cases to lower courts to apply *Tyler* to cases involving pre-*Tyler* property tax sales.  *See Fair v.

Cont'l Res.*, 143 S. Ct. 2580 (2023), *vacating Cont'l Res. v. Fair*, 311 Neb. 184 (2022)

(remanding case "to the Supreme Court of Nebraska for further consideration in light of *Tyler*");

*see also Sharritt*, 2024 WL 4524501, at *13 n.10 (rejecting similar non-retroactivity argument); *Roberto*, 477 N.J. Super. at 365–66 (same).  Courts assessing takings claims brought after *Tyler* and concerning pre-*Tyler* foreclosures, much like the instant case, have also retroactively applied *Tyler*'s holding to permit such cases to move forward, beyond the motion to dismiss stage.  *See Polizzi*, 720 F. Supp. 3d at 150–51; *Woodbridge v. City of Greenfield*, 23 Civ. 30093, 2024 WL 2785052, at *7 (D. Mass. May 29, 2024).  Although the County rightly argues that § 1983 takings claims based on *Tyler* must be brought within the applicable limitations period—an argument addressed below in connection with its motion to dismiss under Rule 12(b)(6)—it does not cite any authority further limiting such claims to property sales that occurred after *Tyler*.

### 2.    Excessive Fines Claims

For much the same reasons, the County's argument that plaintiffs' Excessive Fines claims are unripe is easily put aside.  "Eighth Amendment challenges are generally not ripe until the imposition, or immediately impending imposition, of a challenged punishment or fine." *Cheffer v. Reno*, 55 F.3d 1517, 1523 (11th Cir. 1995); *see also United States v. Quinones*, 313 F.3d 49, 58 (2d Cir. 2002).  The AC alleges such finality with respect to the exactions that it claims are excessive fines, in alleging that the County foreclosed on their properties, sold them at auctions for sums exceeding the tax debts at issue, and retained the excess value.  AC ¶¶ 21–57. It alleges that the fines have all been imposed, and indeed, as to some, that the taxpayer sought and was denied recovery of the surplus.  *See id.* ¶ 51.  The plaintiffs' Eighth Amendment claims are thus ripe.  *See, e.g.*, *Sharritt*, 2024 WL 4524501, at *14–15 (sustaining Excessive Fines claim upon "wholesale loss of [plaintiffs'] equity pursuant to Illinois' tax sale procedures"); *Polizzi*, 720 F. Supp. 3d at 152 (holding that "plaintiffs have plausibly alleged that the County has 'fined' them by retaining 'disproportionate' financial surpluses without attendant Eighth Amendment justifications (beyond the delinquent tax debts)"); *cf. Ramsey*, 2024 WL 4444374, at *3 ("As

with the takings claim, until the surplus value of the property is realized by the City, there is no forfeiture constituting a fine.  Plaintiff's excessive fine claim must also be dismissed without prejudice as unripe.").

### 3.    State Law Claims

Plaintiffs' state law claims are similarly ripe for adjudication.  These are for unjust enrichment (by virtue of the County's having confiscated the property-sale proceeds above the tax debts to which the County was entitled) and for breach of fiduciary duty to plaintiffs (based on plaintiffs' status as owners of property in the County at the time of the foreclosure sales).  Whatever the merits of these claims, the AC alleges real and substantial controversies based on specific facts arising from completed events.  *See Auerbach v. Bd. of Educ. of the Harborfields Cent. Sch. Dist. of Greenlawn*, 136 F.3d 104, 108–09 (2d Cir. 1998).  The issues presented are thus "fit for judicial consideration."  *United States v. Balon*, 384 F.3d 38, 46 (2d Cir. 2004) (citation omitted).

Plaintiffs' claims are therefore all ripe for review.

## III.    The County's Motion to Dismiss for Failure to State a Claim

The County separately argues, under Rule 12(b)(6), for dismissal of certain plaintiffs' claims as untimely.  The Court denies this motion, because the AC does not plead facts sufficient to enable it to reliably determine that the accrual dates as to any of the sales at issue place any plaintiffs outside the limitations period.

### A.    Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly

dismissed where, as a matter of law, "the allegations in a complaint, however true, could not

raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  For the purpose of resolving

the motion to dismiss, the Court must assume all well-pled facts to be true, drawing all

reasonable inferences in favor of the plaintiff.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141,

145 (2d Cir. 2012).  However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S.

at 678.  A pleading that offers only "labels and conclusions" or "a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Expiration of the statute of limitations is an affirmative defense to a claim.  A Rule

12(b)(6) motion to dismiss is a proper vehicle to challenge a claim on this ground.  *Nghiem v.

U.S. Dep't of Veterans Affairs*, 451 F. Supp. 2d 599, 602–03 (S.D.N.Y.2006), *aff'd*, 323 F.

App'x 16 (2d Cir. 2009) ("A motion to dismiss on statute of limitations grounds generally is

treated as a motion to dismiss for failure to state a claim upon which relief can be granted

pursuant to Rule 12(b)(6), as opposed to under Rule 12(b)(1).")  "Rule 12(b)(6) provides the

most appropriate legal basis for a motion to dismiss on such grounds, because expiration of the

statute of limitations presents an affirmative defense." *Id.* at 603.

However, unlike motions directed to the elements of a claim, as to which the issue is

whether the complaint has plausibly pled these elements, a motion directed at this affirmative

defense requires the defendant to establish the expiration of a statutory limitations period.  *Staehr

v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (citing Fed. R. Civ.

P. 8(c)(1)).  Where the defense attempts to establish this on a Rule 12(b)(6) motion, it generally

may rely only on the pleadings—the complaint and the materials it incorporates—and may

secure dismissal only if the allegations in the complaint are such that "the defense appears on the face of the complaint." *Id.*

### B.    Discussion

In § 1983 actions, "the applicable limitations period is found in the 'general or residual [state] statute [of limitations] for personal injury actions[.]'" *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (alterations in original) (quoting *Owens v. Okure*, 488 U.S. 235, 249–50 (1989)).  For claims arising in New York State, that limitations period is three years.  *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013); *see also* N.Y. C.P.L.R. § 214(5).  "Federal law determines when a section 1983 cause of action accrues," and such "accrual occurs 'when the plaintiff knows or has reason to know of the injury which is the basis of [the] action.'" *Pearl*, 296 F.3d at 80 (citation omitted).

"A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Knick*, 588 U.S. at 185.  A property owner thus "suffer[s] a violation of his Fifth Amendment rights when the government takes his property without just compensation, and therefore may bring his claim in federal court under § 1983 at that time." *Id.*

At the threshold, the parties dispute the point at which the limitations period for plaintiffs' takings claims begins to run.  The AC sets out auction dates for each of the foreclosed properties.  These range from July 16, 2019, through February 2, 2023.  AC ¶¶ 21–57.  On this basis, the County argues that the limitations period should begin to run on those dates.  Def. Reply at 3–4.  At the same time, the County concedes that there were other viable points in the foreclosure and sale process which "[p]laintiffs could have . . . utilized as the date of injury," including "the date the Deed into the new owner was filed with the County Clerk," an apparent reference to the date when a new deed, recorded with the County Clerk, transferred ownership of

the property to the purchaser at the auction. *Id.* at 4. Plaintiffs counter that the date of injury should be keyed to the date on which a surplus payment was made to the County but was not returned to them. Pls. Br. at 15. On this basis, they argue for use of the "payment date"—the day the property sale proceeds reached the County—because such is the first time that the surplus could be said to have been held by the County. *Id.*; *see* Giglio Decl. ¶ 46 ("The failure to return surplus funds for which each of the causes of actions herein are based is the act which triggers the start of the statute of limitation timelines."). That date, plaintiffs posit, likely fell after the sale date. *See* Pls. Br. at 15; Giglio Decl. ¶ 46. However, plaintiffs state, they do not know, and therefore did not allege in the AC, the dates the County was paid the proceeds from the sales of their properties. Pls. Br. at 15. Without discovery, they represent, they cannot know this information. *Id.*

The case law as to when takings claims based on retained surpluses accrue has begun only recently to develop, because claims of this nature first proliferated following the decision in *Tyler*. Some cases have treated the accrual date as the date of the property's sale, *see, e.g.*, *Polizzi*, 720 F. Supp. 3d at 147; *cf. Ramsey*, 2024 WL 4444374, at *3 (holding plaintiff's takings claim is not ripe because property has not been sold), while others have treated the accrual date as the date the defendant "took ownership" of the property, *Foshee v. Lane Cnty.*, No. 24 Civ. 447, 2024 WL 3970663, at *2 (D. Or. Aug. 26, 2024), the date a new deed was executed in connection with the property sale, *Biesemeyer*, 2024 WL 1480564, at *3 (citation omitted), or the date the title to the property was "formally transferred," *Stensrud v. Rochester Genesee Reg'l Transp. Auth.*, 507 F. Supp. 3d 444, 452 (W.D.N.Y. 2020). Also defensible, although as-yet unsupported by a reported decision, is plaintiffs' theory that the takings claim should be keyed to the date when the County came into possession of the surplus without transferring it to the

taxpayer.  *Cf. Stephen v. Murray*, No. 14 Civ. 4951, 2016 WL 4402020, at *2 (E.D.N.Y. Aug. 17, 2016) ("Although the Court finds no perfectly congruous Second Circuit authority, other circuit courts of appeals considering accrual and ripeness in the takings context have consistently held that a cause of action does not accrue until a party has a right to enforce the claim." (citation omitted)).

Potentially instructive, too, on this doctrinal point are the mechanics of the distribution scheme for surplus proceeds that the amendment to Article 11 put in place.  It defines "surplus" as "the net gain, if any, realized by the tax district upon the sale of tax-foreclosed property, as determined in the manner set forth in [§ 1196] of this title."  2024 N.Y. Sess. Laws ch. 55, pt. BB § 15 (adding N.Y. Real Prop. Tax Law § 1195).  Section 1196, in turn, entitled "Determination of existence and amount of surplus," gives the County a period of time after the sale to conclude whether a surplus exists:  "Within forty-five days after the sale of tax-foreclosed property, the enforcing officer shall determine whether a surplus is attributable to such sale and if so, the amount thereof," "by ascertaining the sum of the total amount of taxes due plus interest, penalties and other charges."  *Id.* (adding N.Y. Real Prop. Tax Law § 1196).  Thus, under Article 11 as revised, the existence and amount of a surplus is to be determined within 45 days after the auction, so as to enable the calculation and deduction of taxes, interest, penalties, and costs.  These practical realities might support an argument for an accrual date after the date of the sale *and* after the date the sale proceeds came into the County's possession.

On the present record, the Court cannot grant the County's motion to dismiss based on the affirmative defense of the statute of limitations.  The parties have not yet thoughtfully briefed the legal issue as to the accrual date.  And, with very limited exceptions, the pleadings do not set out any potentially pertinent data as to individual plaintiffs, save for the date on which each of

their property parcels was sold.  In these circumstances, unless the Court were prepared to treat

that date as necessarily the accrual date, there is no way to reliably determine the accrual date for

the AC's takings claims.[8]  And because the AC's other claims—the § 1983 claim alleging an

excessive fine in violation of the Eighth Amendment, and the state law claims of unjust

enrichment and breach of fiduciary duty[9]—turn on the County's retention of the surplus payment

from the foreclosure sale, the accrual date for these claims is also indeterminate at this stage.[10]

The Court therefore denies the County's motion to dismiss for failure to state a claim.

The denial of this motion is without prejudice to the County's right, upon a fuller factual record

and more thorough briefing, to move anew on the ground that some or all of plaintiffs' claims are

---

[8] By the Court's tabulations, were the auction dates as pled used as the accrual dates, the takings claims of eight of the 25 plaintiffs would appear to be time-barred, as these claims were brought more than three years after the corresponding auction date.  *See* AC ¶¶ 23, 25, 43, 47, 49, 54.

[9] Regardless of the accrual date, a challenge to these claims based on the statute of limitations appears unlikely to decide the issue, because the property sales, as pled, occurred in 2019 or later and "[t]he statute of limitations in New York for claims of unjust enrichment [and] breach of fiduciary duty . . . is generally six years."  *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 518 (2d Cir. 2001) (citing N.Y. C.P.L.R. §§ 213(1), (7)).

[10] The parties separately dispute the date when the limitations period ceased to run.  The dispute arises because plaintiffs initially filed this action in an improper forum: the Northern District of New York.  *See* Dkts. 1–3.  In moving to dismiss, the County argues that the limitations period continued to run until the case was transferred to this Court.  Def. Reply at 4.  Plaintiffs counter that the original filing date, notwithstanding the improper forum, governs the limitations inquiry.  Pls. Br. at 13–14.  Plaintiffs are correct.  *See U.S. ex rel. Smith v. Yale Univ.*, No. 2 Civ. 1205, 2006 WL 1168446, at *3 (D. Conn. Apr. 28, 2006) (noting that courts have held that "transfer, rather than dismissal, would serve the interest of justice . . . [because] the refusal to transfer this case would result in serious prejudice to Plaintiff, for many of Plaintiff's claims, if re-filed in New York, would be barred by the applicable statutes of limitations."); *see also Minnette v. Time Warner*, 997 F.2d 1023, 1026–27 (2d Cir. 1993) (transferring rather than dismissing a case filed in an improper district, on the grounds that 28 U.S.C. § 1406(a) aims "to eliminate impediments to the timely disposition of cases and controversies on their merits," and that transfer to the proper district, unlike dismissal followed by commencement of a new action in that district, would preserve the original filing date for limitations purposes and avoid the prejudice caused by the potential that a new action would be dismissed as untimely).

time-barred. *See, e.g.*, *Frankel v. Cole*, 313 F. App'x 418, 420 (2d Cir. 2009) (reinstating claims because "it [wa]s not clear from the face of the complaint when plaintiffs . . . sustained [or discovered] the alleged injuries for which they seek redress"); *Wang v. Palmisano*, 51 F. Supp. 3d 521, 537 (S.D.N.Y. 2014) (denying motion to dismiss federal claim on timeliness grounds because "it is unclear when the statute of limitations . . . began to run").

## CONCLUSION

For the foregoing reasons, the Court denies the County's motions to dismiss. The Clerk of Court is respectfully directed to terminate the motion pending at Docket 25.

Discovery will now commence. By January 6, 2025, the parties are to submit a proposed case management plan, consistent with the Court's individual rules, that provides for the close of fact discovery by the end of April 2025.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated:  December 27, 2024
        New York, New York