UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GLORIA CAVALUZZI *et al.*,

                                          Plaintiffs,

                    -v-

COUNTY OF SULLIVAN,

                                          Defendant.

---

23 Civ. 11067 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

In *Tyler v. Hennepin County*, 598 U.S. 631 (2023), the Supreme Court held that a county could be liable for taking private property without just compensation where, after foreclosing on and selling a taxpayer's real property in order to extinguish her property tax debt, it kept for itself the proceeds of the sale beyond those necessary to extinguish the debt. That was so regardless of the fact that the county, in retaining the excess proceeds, acted pursuant to state law.

This case is based on and was brought shortly after the *Tyler* decision. It entails similar claims by 25 residents of New York's Sullivan County (the "County"), whose properties the County sold to satisfy local tax delinquencies. They claim that the County violated the Takings Clause of the Fifth Amendment of the Constitution, applicable to the States through the Fourteenth Amendment, when it retained the proceeds of the tax foreclosure sales in excess of the sum necessary to pay the outstanding property taxes, interest, and penalties. Based on the same conduct, plaintiffs also claim violations of the Excessive Fines Clause of the Eighth Amendment and, separately, of New York State law.

In a decision issued December 27, 2024, the Court denied the County's first motion to dismiss plaintiffs' Amended Complaint ("AC"). The Court rejected the County's arguments that

subject-matter jurisdiction was lacking, on the ground that the AC's claims were not ripe, *see* Fed. R. Civ. P. 12(b)(1), and that the AC did not state a claim, including because plaintiffs' claims were purportedly untimely, *see* Fed. R. Civ. P. 12(b)(6); *Cavaluzzi v. Cnty. of Sullivan*, No. 23 Civ. 11067 (PAE), 2024 WL 5238644 (S.D.N.Y. Dec. 27, 2024) ("*Cavaluzzi I*"). The County then stated that it wished to make a new round of arguments for dismissal. These included that plaintiffs' claims present a nonjusticiable political question, requiring dismissal for lack of subject-matter jurisdiction, and that plaintiffs had improperly failed to join New York State (the "State") as a necessary party. Dkt. 63-1 at 2–3; *see* Dkt. 77 ("Tr.") at 25–27. The Court ordered the County to forthwith file any such motions to dismiss, limited to the new grounds it identified. Dkt. 72.

Pending now is the County's second motion to dismiss the AC, under Federal Rules of Civil Procedure 12(b)(1), 12(b)(7), and 19.[1] For the reasons that follow, the Court again denies the County's motion.

---

[1] In its second motion to dismiss, the County separately moved to dismiss for failure to state a claim and untimeliness under Rule 12(b)(6). Dkt. 75. In permitting a second such motion, however, the Court did not authorize the County to make these motions. *See* Dkt. 72. The County had previously tried once to obtain dismissal under Rule 12(b)(6), based on the statute of limitations, *see* Dkt. 27, and the Court denied that motion, without prejudice to the County's right to move anew for such relief *after discovery*, *see Cavaluzzi I*, 2024 WL 5238644, at *7–10. The Court pointedly did not authorize, and would not have authorized, the County to move again on these grounds. The motions that the Court is permitting, under Rules 12(b)(l) and 19, are distinct, as these present new arguments which challenge, respectively, the Court's jurisdiction and capacity to hear this case. *See* Dkt. 76.

## I.    Background[2]

The Court assumes familiarity with the case's factual and procedural background, which is set out in detail in *Cavaluzzi I*, 2024 WL 5238644, at *1–4.  The following summary is limited to the facts necessary to resolve the discrete issues presented here.

### A.    Factual Background

#### 1.    The Development of New York's Pre-*Tyler* Tax Statutory Scheme

Before 1993, New York counties could enact their own local tax foreclosure laws. Bullard Decl. ¶¶ 12–15; Pls. Letter at 1.  However, Chapter 602 of the Laws of 1993 (the "1993 legislation"), in amending New York's Real Property Tax Law ("RPTL"), put in place a statewide statutory scheme for the enforcement and collection of delinquent property taxes at the local level, known as "Article 11" or "the Uniform Delinquent Tax Enforcement Act."  RPTL § 1104 (McKinney 1993).  Article 11's provisions applied to all New York counties and cities and "supersede[d] any inconsistent general, special or local law," except for those municipalities that (1) had previously enacted local tax procedures and (2) chose to opt out of Article 11.  *Id.*  The 1993 legislation thus effectively grandfathered in municipalities that had enacted their own statutory schemes and chose to retain them in lieu of Article 11's procedures. *See* Bullard Decl., Ex. B (Tax Enforcement Instructions and Forms (Sept. 1995)) at 1 ("Most of these 'tax districts' are now subject to the tax enforcement system established by the new Article 11.  However, a limited number of tax districts were given the right to 'opt-out' of the

---

[2] The following account is drawn from the AC, Dkt. 24, and the parties' submissions on the County's pending motions.  These include the County's memorandum of law, Dkt. 75-8 ("Def. Br."), and exhibits thereto; and H. Todd Bullard's declaration, Dkt. 75-1 ("Bullard Decl."), in support of the County's motion; plaintiffs' opposition, Dkt. 79 ("Pls. Br."); the County's supplemental letter, Dkt. 80 ("Def. Letter"), and exhibits thereto; and plaintiffs' supplemental letter, Dkt. 81 ("Pls. Letter"), and exhibits thereto. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings.").

new Article 11, and did so."). Tax districts that had opted out could thereafter adopt the Article 11 procedures. RPTL § 1106 (McKinney 1994). In total, nine counties, 24 cities, and dozens of villages, opted out, and were not subject to the 1993 uniform tax enforcement program. *See* Bullard Decl., App. A.

Article 11 does not textually command a county whether to retain—or return to the taxpayer—the surplus from a foreclosure sale. Contemporaneous legislative materials, however, suggest that each taxing district had the discretion, but not necessarily the obligation, to retain such a surplus. *See id.*, Ex. A at 3 ("Surplus and Deficiency: The tax district would retain its right to keep any surplus resulting from the disposition of property acquired through tax enforcement proceedings."); *id.*, Ex. A at 4 ("The State Board recommends that State policy permitting retention of surplus by tax districts not be changed."). Consistent with that reading, a Government Memorandum approving Article 11 stated that the amendment was intended to create a uniform system of collecting delinquent real property taxes while "giving local governments greater administrative flexibility," including by permitting counties to recoup fees associated with foreclosures, collect delinquent taxes in installments, and contract with banks to pursue tax collection. *Id.*, Ex. A at 1 (citing Memorandum No. 39, New York Executive Chamber, NY (Aug. 4, 1993), Bill Jacket, L. 1993, Ch. 602).

Sullivan County had not, before 1993, enacted its own local tax enforcement procedure. Article 11's provisions thus applied to it. As of 2023, when *Tyler* was decided, Article 11 thus authorized Sullivan County to engage in the practice that the plaintiff in *Tyler* challenged as a violation of the Takings Clause: the retention by a taxing authority of the surplus proceeds from the sale of a tax delinquent property. *See* RPTL §§ 1190, 1194 (McKinney 2003).

### 2.    *Tyler*

Geraldine Tyler owned a condominium in Hennepin County, Minnesota, on which unpaid property taxes had accumulated. *Tyler*, 598 U.S. at 635. Hennepin County, acting under Minnesota's forfeiture procedures, seized and sold her condominium for more than her outstanding debt. *Id.* As mandated by Minnesota's tax scheme, Hennepin County kept the surplus for its own use. *Id.* Tyler filed a putative class action against the county and its officials. She claimed that, in retaining the surplus, Hennepin County had violated the Takings Clause, applicable to the States through the Fourteenth Amendment, and the Eighth Amendment's Excessive Fines Clause. *Id.* at 635–36.

On May 25, 2023, the Supreme Court issued its unanimous decision in *Tyler*. Ruling for Tyler on her takings claim, the Court held that a county cannot retain surplus money from the sale of foreclosed property to satisfy a delinquent property tax debt, without providing the taxpayer an opportunity for recovery of the surplus. *Id.* at 639–40. Doing so, the Court held, effected a "classic taking in which the government directly appropriates private property for its own use" without just compensation. *Id.* at 639 (citation omitted).

The Court recognized that Hennepin County had "had the power to sell Tyler's home to recover the unpaid property taxes." *Id.* at 639. But, it held, the county "could not use the toehold of the tax debt to confiscate more property than was due." *Id.* at 639. The Takings Clause, it explained, "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Id.* at 647 (citation omitted). The Court emphasized, however, that where state law "simply defin[es] the process through which the owner could claim the surplus," such would not offend the Takings Clause, because the law had made available a means to secure just compensation.

*Id.* at 644 (citing *Nelson v. City of New York*, 352 U.S. 103, 109–11 (1956)). Minnesota law, however, lacked any such mechanism for recovery. *Id.* at 644–45.

### 3.    New York's Post-*Tyler* Amendment of Article 11

In an attempt to adapt state law to *Tyler*, on April 23, 2024, New York Governor Kathy Hochul signed into law an amendment to Article 11. 2024 N.Y. Sess. Laws ch. 55, pt. BB. It put in place a process by which an owner can claim and pursue a surplus from a sale of a tax-foreclosed property. *Id.* Salient to the claims of the plaintiffs here, however, the amendment has only limited retroactive application. In general, it makes relief (a mechanism to obtain repayment of surpluses retained by a county) available only for sales of tax-foreclosed property that occurred "on or after May 25, 2023," the date the Supreme Court decided *Tyler*. *Id.* § 19; *see also In re Seelbach*, 218 N.Y.S.3d 200, 213 (N.Y. Sup. Ct. 2024). For properties sold before May 25, 2023, however, a taxpayer may pursue a claim for the surplus on such sale only if (1) he or she had timely initiated a proceeding to compel the "tax district to distribute such surplus" pursuant to Article 78 of the New York Civil Practice Law and Rules, and (2) that proceeding remained active as of April 20, 2024. 2024 N.Y. Sess. Laws ch. 55, pt. BB § 19.[3] The April 2024 amendment to Article 11, however, does not afford relief to property owners who do not satisfy these qualifications.

### B.    This Litigation

Plaintiffs are a group of 25 owners of properties in Sullivan County who failed to pay local property taxes and penalties. AC ¶¶ 21–57. The County foreclosed on their properties, and sold these at tax auctions between July 16, 2019, and February 2, 2023, *i.e.*, before *Tyler* was

---

[3] Article 78 provides a mechanism to challenge as unlawful a decision by a New York State official or administrative agency. *See* N.Y. C.P.L.R. 7803(1).

decided on May 25, 2023. *Id.* ¶¶ 21–57.[4]  In each case, the properties sold for an amount

exceeding the plaintiff's tax debt, with the resulting surpluses ranging from $5,750, *id.* ¶¶ 27–28,

to $250,000, *id.* ¶ 31–32, and an average surplus of $51,000.  The County retained, and to date

has not returned, the excess funds. *See id.* ¶ 51.

On December 5, 2023, the 25 plaintiffs sued the County and Nancy Buck, in her official

capacity as its treasurer, in federal district court in the Northern District of New York.  Dkt. 1.

They brought claims under 42 U.S.C. § 1983, contending that the County's retention of the

surplus from the tax foreclosure sales violated the Takings and Excessive Fine Clauses. *Id.*

They also brought state law claims of unjust enrichment and breach of fiduciary duty. *Id.*

On December 8, 2023, the Hon. Frederick J. Scullin, finding that the parties reside, and

all relevant events occurred, in this District, issued an order directing the transfer of the case to

this District.  Dkt. 2.  On December 21, 2023, the case was transferred to this Court.  Dkt. 3.

On March 8, 2024, defendants filed a motion to dismiss, a declaration, and a supporting

memorandum of law.  Dkts. 18–20.  On March 11, 2024, the Court issued an order directing

plaintiffs to amend their complaint or oppose the motion to dismiss.  Dkt. 21.  On March 28,

2024, plaintiffs filed the AC, removing Buck as a defendant.  Dkt. 22; *see* Dkt. 24.  On April 18,

2024, the County filed a motion to dismiss the AC.  It argued that plaintiffs' claims were moot,

non-ripe, and untimely.  Dkts. 25–27.  On May 22, 2024, plaintiffs opposed.  Dkt. 32.  On

May 29, 2024, the County replied, Dkt. 33, and on June 14, 2024, plaintiffs filed a sur-reply,

---

[4] With one exception:  the AC originally included claims by plaintiffs Randy and Elizabeth
Kleingardner, whose property was sold at a tax-foreclosure auction on or about September 27,
2023, that is, after the effective date of New York's post-*Tyler* amendment to Article 11.  *Id.*
¶ 39.  On September 17, 2024, the Kleingardners voluntarily dismissed their claims in this action
to instead pursue the administrative remedy that the amended Article 11 made available. *See*
Dkts. 51–52.

Dkt. 36.  On December 27, 2024, as noted, the Court denied the motion to dismiss in its entirety.

Dkt. 53.

On January 10, 2025, the Court scheduled an initial conference.  Dkt. 62.  On January 21,

2025, the parties, per the Court's Individual Rules, filed a joint letter addressing various issues,

including contemplated motions.  Dkt. 63-1.  In it, the County indicated that it wished to move

again to dismiss, making new arguments.  *Id.*  The Court reviewed these during the January 23,

2025 conference, Dkt. 77, and set a briefing schedule for the County's second motion to dismiss,

on grounds of (1) lack of subject-matter jurisdiction, based on reasons not raised by defendants'

initial motion to dismiss, and (2) failure to name a necessary party, Dkt. 72.

On January 29, 2025, the County filed its new motion to dismiss, Dkt. 75, a declaration,

Dkt. 75-1, and attached exhibits.  On February 6, 2025, plaintiffs opposed.  Dkt. 79.  On

February 12, 2025, the County filed a supplemental letter, with attached exhibits.  Dkt. 80.  On

February 14, 2025, plaintiffs filed a supplemental letter, with attached exhibits.  Dkt. 81.

## II.    Nonjusticiable Political Question

The Court first considers the County's argument for dismissal for lack of subject-matter

jurisdiction under Rule 12(b)(1), on the ground that the AC's claims present a nonjusticiable

political question.

### A.    Applicable Legal Standards

The political question doctrine "is more properly characterized as a 'justiciability'

question than as a question of subject matter jurisdiction.  Nevertheless, it is properly raised on a

motion under Rule 12(b)(1)."  *Aiello v. Kellogg, Brown & Root Servs., Inc.*, 751 F. Supp. 2d 698,

702 (S.D.N.Y. 2011) (citing *Baker v. Carr*, 369 U.S. 186, 198 (1962)).  In resolving a dismissal

motion under Rule 12(b)(1), the Court must accept as true all material facts alleged in the

complaint and draw all reasonable inferences liberally in plaintiff's favor.  *Kwiatkowski v. Polish*

*& Slavic Fed. Credit Union*, 511 F. App'x 117, 118 (2d Cir. 2013); *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003). However, the Court may consider evidence outside the pleadings. *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008).

### B.    Discussion

In invoking the political question doctrine, the County argues that the AC implicates "political issues that involve the assessment, levy, or collection of any tax under State law." Def. Br. at 3. It notes that its pre-*Tyler* practice of keeping foreclosure tax surpluses derives from New York State's foreclosure scheme, which the County effectively opted into by not enacting its own tax foreclosure law when it could (*i.e.*, before 1993). *See id.* at 5–9. The history by which the County came to retain foreclosure surpluses, however, does not trigger the political question doctrine. Nothing in that doctrine prevents the Court—any more than in *Tyler*—from exercising jurisdiction over claims that a County's retention of foreclosure surpluses from the sales of plaintiff's properties is unconstitutional under the Takings Clause.

The political question doctrine is "essentially a function of the separation of powers." *Baker*, 369 U.S. at 217. It "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see also Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007) ("It is therefore familiar learning that no justiciable 'controversy' exists when parties seek adjudication of a political question[.]" (citation omitted)).[5] In *Baker*, the Supreme Court identified six factors, the presence of which indicates a political question:

---

[5] The doctrine presents a "threshold" issue, properly addressed before a Court reaches any merits-based arguments. *See Can v. United States*, 14 F.3d 160, 162 n.1 (2d Cir. 1994); *Aiello*, 751 F. Supp. 2d at 704 n.1.

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or

[2] a lack of judicially discoverable and manageable standards for resolving it; or

[3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

[4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or

[5] an unusual need for unquestioning adherence to a political decision already made; or

[6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217; *see also Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (*Baker* factors "are probably listed in descending order of both importance and certainty"). Any one factor can support the finding of a political question, but unless that factor "is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Baker*, 369 U.S. at 217.

As the Second Circuit has recognized, "*Baker* set a high bar for nonjusticiability." *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 321 (2d Cir. 2009). The Supreme Court has "only rarely found that a political question bars its adjudication of an issue." *Id.*[6] Critical here, the fact that a plaintiff is seeking to hold a government unit liable, and obliged to pay damages, for an unconstitutional practice authorized by state law does not trigger the political question doctrine. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196–97 ("No policy

---

[6] *See also* Rachel E. Barkow, *More Supreme Than Court? The Fall of the Political Question Doctrine & the Rise of Judicial Supremacy*, 102 Colum. L. Rev. 237, 267–68 (2002) ("[I]n the almost forty years since *Baker v. Carr* was decided, a majority of the Court has found only two issues to present political questions, and both involved strong textual anchors for finding that the constitutional decision rested with the political branches.").

underlying the political question doctrine suggests that Congress or the Executive . . . can decide the constitutionality of a statute; that is a decision for the courts." (citation omitted)); *Elrod v. Burns*, 427 U.S. 347, 352 (1976) (political question doctrine "is no obstacle to judicial review" of government practice). Quite the contrary, claims to this effect, brought under 42 U.S.C. § 1983, are quotidian subjects of federal-court merits litigation. *See, e.g., Williams v. Reed*, 145 S. Ct. 465, 468 (2025) ("This Court has long held that 'a state law that immunizes government conduct otherwise subject to suit under § 1983 is preempted, even where the federal civil rights litigation takes place in state court.'" (citation omitted)); *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 143 (2023) ("By its terms, § 1983 is available to enforce every right that Congress validly and unambiguously creates[.]"); *Tyler*, 598 U.S. at 642–44 (collecting cases).

The County's invocation of the political question doctrine here is sparse and conclusory. It does not identify the *Baker* factors that plaintiffs' claims ostensibly implicate. It does not cite these (or *Baker* itself). Instead, the County bases its argument on two propositions: that a federal court (1) may not "interfer[e] with so important a local concern as the collection of taxes," and (2) lacks "jurisdiction to legislate or create new statutory provisions." Def. Br. at 4. These statements, more sound-bites than legal arguments, do not avail the County.

The County's first argument is at odds with a wide body of precedent. It includes *Tyler* itself, and earlier cases in which plaintiffs successfully voided tax regimes under the Takings Clause. *See, e.g., Tyler*, 598 U.S. at 638 (invalidating Minnesota law requiring retention of surplus after county sold property to private party); *United States v. Lawton*, 110 U.S. 146, 149–50 (1884) (invalidating federal law to the extent it permitted retention for federal government's use of surplus of foreclosed property it had seized). Beyond that, numerous cases

have held federal and state tax authorities liable for unlawful exactions, whether on constitutional or other grounds. *See, e.g.*, *Freed v. Thomas*, 81 F.4th 655, 661 (6th Cir. 2023) (in § 1983 case, affirming grant of summary judgment in favor of taxpayer on Fifth Amendment challenge to county's retention of surplus funds); *Sharritt v. Henry*, No. 23 Civ. 15838, 2024 WL 4524501, at *6, *15–16 (N.D. Ill. Oct. 18, 2024) (in § 1983 case, denying motion to dismiss takings claims against county for unlawful retention of surplus; court upholds claim of *Monell* liability and rejects defense based on *Rooker-Feldman* abstention); *Polizzi v. Cnty. of Schoharie*, 720 F. Supp. 3d 141, 150–51 (N.D.N.Y. 2024) (in § 1983 case, denying motion to dismiss claims against county of Takings Clause violations for retention of surplus funds). *Tyler* itself recognized the history, dating to common law, in which courts have both enforced the imposition of local taxes and guarded against unlawful takings by tax authorities. *See Tyler*, 598 U.S. at 639 ("The principle that a government may not take more from a taxpayer than she owes can trace its origins at least as far back as Runnymede in 1215 . . . . That doctrine became rooted in English law. . . [and] made its way across the Atlantic.").

There is nothing in the text of Article 11 that suggests that the New York legislature, improbably, believed its tax foreclosure scheme implicated political questions excluded from judicial review. And Article II's legislative history is squarely to the contrary. *See* Bullard Decl., Ex. A (excerpts from Bill Jacket No. 7956-C (1993–94)) at 1 ("The bill establishes a uniform system, applicable to most of the State's tax jurisdictions, for the enforcement of delinquent real property taxes through judicial foreclosure proceedings."); *see id.*, Ex. B (Sept. 1995 N.Y.S. Off. of Real Prop. Servs. Instructions and Forms) at 11 ("When the redemption period ends, the court will determine the rights of the parties in any parcels which have not been redeemed." (citing RPTL § 1136 (McKinney 1995)). The 1993 legislation that amended

Article 11—much like the later 2024 revisions that adapted the RPTL to *Tyler*—instead served

the limited purposes of adapting the statute, with future adjudication in mind, to an intervening

Supreme Court decision, *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791 (1983), which

addressed the notice due property owners. *See* Bullard Decl., Ex. A at 1 (stating that RPTL's

provisions for providing notice of foreclosure sales to property owners "have been

constitutionally suspect since the . . . decision in *Mennonite Board of Missions v. Adams*.

Subsequent federal and state court decisions have underscored the need for reform. The bill

revises the statutory notice requirements for tax lien foreclosures."). This case, in which

plaintiffs do not challenge the act of foreclosure but seek a return of the surplus from the sale, is

the sort of court proceeding that the notice provision served to facilitate.

The County's second observation, that a court does not have a charter to set tax policy, is

beside the point. Plaintiffs here are not seeking to make new tax policy. They are seeking to

vindicate constitutional rights under the Takings Clause that the Supreme Court recognized in

*Tyler*. This Court's charter is not to make policy, but to administer this lawsuit, which will test,

through trial if necessary, whether the County unconstitutionally retained the excess value of

plaintiffs' properties above their tax debts, and whether plaintiffs have viable (*e.g.*, timely)

claims to vindicate these constitutional rights. That charter, which requires the application of

constitutional law to a factual record that will be developed, is quotidian. Indeed, it is one that,

since *Tyler*, courts across the country have been called upon to undertake where counties are

claimed to have retained excess proceeds from tax foreclosure sales. *See, e.g.*, *Cavaluzzi I*, 2024

WL 5238644, at *2 & n.2 (collecting cases). This case is unusual only in that Sullivan County

appears to be the only county to make the audacious argument in a post-*Tyler* case that its

property-holders are prevented from pursuing Takings Clause claims by the political question doctrine.[7]

Applying the *Baker* standards, the County's argument that plaintiffs' claims present a nonjusticiable political question is baseless. On the contrary, this case is on all fours with *Tyler*, in which the Supreme Court entertained—and granted relief based on—an identical Takings Clause claim. The Minnesota statutory scheme at issue in *Tyler* "provide[d] no opportunity for the taxpayer to recover the excess value; once absolute title ha[d] transferred to the State, any excess value always remain[ed] with the State." 598 U.S. at 644. And the Supreme Court, reviewing precedents recognizing "that a taxpayer is entitled to the surplus in excess of the debt owed," held it proper to adjudicate Tyler's claims. *Id.* at 642–44 (collecting cases). In voiding the Minnesota scheme that did not provide a procedure for surplus recovery, it contrasted that scheme with *Nelson v. City of New York*, 352 U.S. 103 (1956), where the city ordinance at issue had set out a process by which property owners could recover surplus funds from foreclosure sales of their properties. *Tyler*, 598 U.S. at 644. Plaintiffs likewise argue that Sullivan County's scheme, like that in *Tyler*, denies them a mechanism for a taxpayer to seek the return of surplus funds taken by a county after a foreclosure sale.

The political question doctrine does not fit these circumstances. The County has not made a serious argument that plaintiffs' Takings Clause claims—any more than the meritorious

---

[7] The Court made this point at the initial case conference in questioning whether the County could make a non-frivolous argument that the political question doctrine blocks this *Tyler*-based damages action. *See* Tr. at 23 (describing this case as "not at all unusual," noting that the other post-*Tyler* cases "seem to be proceeding just fine," and that the plaintiffs here are "seeking the most rudimentary remedy for a taking, which is cold hard cash, which is the money [']taken without just compensation.[']"). At that conference, the County could not identify a post-*Tyler* case in which a court had sustained such an argument. *See* Tr. at 25–26, 28. The County's brief in support of its dismissal on this ground is also devoid of supportive case authority.

such claim in *Tyler*—is constitutionally committed to a coordinate branch, is incapable of ready resolution by the application of manageable standards, would force a court to make a "policy determination" for which courts are unsuited, would require a court to express a "lack of the respect due coordinate branches of government," would undermine necessary "adherence to a political decision," or would cause "embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217. In the proliferating post-*Tyler* lawsuits by plaintiffs around the country seeking to recover surpluses based on *Tyler*, no court has found such a claim to present a nonjusticiable political question. The County has failed to identify any reason to break new ground here.

The Court accordingly denies the County's motion to dismiss for lack of subject matter jurisdiction, based on the political question doctrine. *See, e.g., McMahon v. Gen. Dynamics Corp.*, 933 F. Supp. 2d 682, 694–95 (D.N.J. 2013) (denying motion to dismiss on political question grounds where court would not "*inevitably*" be drawn into a political question) (emphasis in original); *Aiello*, 751 F. Supp. 2d at 706 (same); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 438 F. Supp. 2d 291, 304 (S.D.N.Y. 2006) ("Plaintiffs' claims fall into the realm of justiciable questions and do not implicate a political question as defined by *Baker*.").

## III.    The County's Motion to Dismiss for Failure to Joint a Necessary Party

The County separately argues, under Rule 12(b)(7), for dismissal for plaintiffs' failure to join the State, a purported necessary party under Rule 19. That motion fails, because complete relief is achievable among the parties, and the State's participation is unnecessary to resolve plaintiffs' claims.

## A.    Applicable Legal Standards

A party may seek dismissal under Rule 12(b)(7) for failure to join a necessary party under Rule 19. Rule 12(b)(7) requires a district court to "dismiss an action where a party was not joined only if: (1) an absent party is required, (2) it is not feasible to join the absent party, and (3) it is determined 'in equity and good conscience' that the action should not proceed among the existing parties." *In re Great Atl. & Pac. Tea Co., Inc.*, 467 B.R. 44, 58 n.9 (S.D.N.Y. 2012) (quoting *Republic of Phil. v. Pimentel*, 553 U.S. 851, 862–63 (2008)), *aff'd sub nom. Grocery Haulers, Inc. v. Great Atl. & Pac. Tea Co.*, 508 F. App'x 63 (2d Cir. 2013) (summary order).

Under Rule 19(a)(1), a person must be joined as a necessary party, if feasible, if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a). The second prong of Rule 19(a) requires that "there must be more than an unsupported assertion that [the non-joined party] has a claim to that interest." *Jonesfilm v. Lion Gate Int'l*, 299 F.3d 134, 140 (2d Cir. 2002).

"Where a court makes a threshold determination that a party is necessary under Rule 19(a) and joinder of the absent party is not feasible for jurisdictional or other reasons, the court must then determine whether the party is 'indispensable' under Rule 19(b)." *Dunn v. Standard Bank London Ltd.*, No. 5 Civ. 2749, 2006 WL 217799, at *2 (S.D.N.Y. Jan. 30, 2006) (citing *Universal Reinsurance Co. v. St. Paul Fire & Marine Ins. Co.*, 312 F.3d 82, 87 (2d Cir. 2002)). It provides that "[t]he court must determine whether, in equity and good conscience, the

16

action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).

Rule 19(b) sets forth several "factors for the court to consider" in determining whether an absent

party is indispensable:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>    a. protective provisions in the judgment;
>    b. shaping the relief; or
>    c. other measures;
>
> (3)  whether a judgment rendered in the person's absence would be adequate; and
>
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*Id.*

## B.    Discussion

The County argues that the State was a necessary and indispensable party which Rule 19

required plaintiffs to join. Def. Br. at 15–18. Its principal basis for that argument is that the

State's 1993 legislation bound the County, and, in the County's telling, forbade it from returning

excess foreclosure proceeds to property owners, and that because state law purportedly impeded

the County from returning the excess, it is a required party to this suit. *Id.* Plaintiffs counter that

complete relief is achievable among the current parties—plaintiffs and the county that foreclosed

upon their properties. Pl. Br. at 8–9. Plaintiffs note that, if the County loses this § 1983 action

and believes it has recourse against the State, it will be at liberty to pursue such relief in a follow-

on action. *Id.* Plaintiffs are correct.

*Tyler* again is on point. The putative class action there, bringing identical claims to those

here, was filed solely against Hennepin County and its officials, and litigated through to

conclusion without joinder of the State of Minnesota, notwithstanding that the county's actions

in retaining the excess funds were taken pursuant to Minnesota's forfeiture scheme. *Tyler*, 598 U.S. at 635. New York State is no more a necessary party to this suit than Minnesota was there. *See Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, 647 F. Supp. 3d 145, 201–02 (S.D.N.Y. 2022) (declining to assess claim of a non-party's indispensability upon a finding that the non-party was unnecessary); *Granda v. Trujillo*, No. 18 Civ. 3949 (PAE), 2019 WL 367983, at *12–13 (S.D.N.Y. Jan. 30, 2019) (same).

The County's counterarguments fail. It primarily argues that the State was responsible for the County's retention of the excess funds after the forfeiture, because such was required by the State's 1993 enactment of Article 11, amending the RPTL. For multiple reasons, that argument fails. At the outset, the County's factual premise that Article 11 obliged, as opposed to authorized, it to retain forfeiture proceeds in excess of the property-owner's tax delinquency, is far from clearly correct.[8] But even if it were, the choice to adopt such a statutory scheme, as reviewed above, was the County's. Sullivan County had been at liberty through 1993 to adopt its own statutory scheme governing forfeiture proceedings, but unlike many other counties, it chose not to do so. *See supra* Section I.A.1. More fundamentally, even crediting that the County's hands were tied by the State, the County's retention of funds in excess of those needed to cover a tax delinquency makes it a party against whom a plaintiff seeking damages under § 1983 for an

---

[8] As noted above, the text of 1993 Article 11 does not say anything of the sort. Although it set forth a uniform system applicable to municipalities that had not previously enacted their own tax laws and opted out of the legislation, Article 11 is silent as to treatment of surplus funds. And the legislative materials the parties cite do not support that municipalities were required (as opposed to authorized) to retain surplus funds. *See* Bullard Decl., Ex. A, at 3 ("The tax district would retain its right to keep any surplus resulting from the disposition of property acquired through tax enforcement proceedings."); *id.* at 4 ("The State Board recommends that State policy *permitting* retention of surplus by tax districts not be changed.") (emphasis added); *see also* Pls. Letter at 2 ("Sullivan County's conclusion also rests on a perhaps more important second false factual premise, *i.e.*, that Article 11 *requires* that a municipality retain the surplus." (emphasis in original)).

unlawful taking can obtain complete relief: repayment of the excess. The State's presence as a party is unnecessary to vindicate that claim. *See MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 385 (2d Cir. 2006) ("While there is no question that further litigation between Visa and FIFA, and perhaps MasterCard and Visa, is inevitable if MasterCard prevails in this lawsuit, Rule 19(a)(1) is concerned only with those who are already parties. MasterCard can obtain complete relief *as to FIFA* without Visa's presence in the case." (emphasis in original)).

The County next notes that under the amended Article 11, a plaintiff could pursue relief for the same alleged Takings Clause violation by initiating an Article 78 proceeding in state court. It argues that, were such a proceeding to occur alongside this lawsuit, inconsistent outcomes, yielding inconsistent obligations for the County, potentially could result. Def. Br. at 16, citing Fed. R. Civ. P. 19(a)(1)(B)(ii) (non-party's joinder required if absence "leave[s] an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest"). That argument fails for multiple reasons. First, as the County elsewhere admits, the only plaintiffs in this case who had the right under the amended Article 11 to pursue relief were those who sold property after the amendment's explicit cutoff date of May 25, 2023, and who had initiated Article 78 proceedings that were ongoing as of that date. *See* 2024 N.Y. Sess. Laws ch. 55, pt. BB § 19. There was only one such pair of plaintiffs, the Kleingardners, and, months ago, they dismissed their claims in this action in favor of the administrative avenue opened by the amended Article 11. *See* Dkt. 52 ("[T]he Plaintiffs, Randy Kleingardner and Elizabeth Kleingardner, *only* have elected to and chosen to pursue the available remedies under New York state law to claim surplus as specifically set forth in the amended provisions of Article 11 of the RPTL and as a result . . . [they] shall discontinue their federal court action, and agree to the dismissal of their claims only." (emphasis in original)). The

surviving plaintiffs, however, claim injuries from property sales before May 25, 2023. Having

not pursued Article 78 relief as of the enactment of the April 23, 2024 amendment to Article 11,

however, they are ineligible to pursue this administrative remedy. *See* AC ¶¶ 21–38, 41–57.

Second, even as to a property owner in the Kleingardners' position, the County's premise that he

or she would have the right under amended Article 11 to concurrently pursue federal-court *and*

administrative remedies is conjecture. The County does not support this *ipse dixit*. Third, even

if an aggrieved plaintiff in this case could concurrently pursue relief administratively and in

court, there would not be an evident need for *the State* to be a party to either action. The County

instead would be the proper defendant. The County's stated concern about duplicative or

inconsistent outcomes thus does not implicate Rule 19(a)(1)(B)(ii).

The County's position on this point is further undermined by the pattern of post-*Tyler*

litigation in this state. In permitting the County to file a motion to the effect that the State was an

indispensable party, the Court ordered it to address why all claims against the State had been

dismissed in *Mkrtchyan v. Orange Cnty.*, 23 Civ. 10770 (S.D.N.Y.), Dkt. 72, a post-*Tyler* case

raising similar claims which the County earlier sought (unsuccessfully) to consolidate with this

case, *see* Dkts. 57–60. The County was unable to respond to that question, beyond offering the

conjecture that perhaps the plaintiffs in *Mkrtchyan* had made a "strategic decision" to drop the

State. Def. Br. at 17. Regardless of its impetus, the dismissal of such claims in *Mkrtchyan* sits

uneasily alongside the County's claim here that the State is a necessary party. *See also Steele v.*

*Saratoga Cnty.*, No. 23 Civ. 1615 (N.D.N.Y. 2023), Dkt. 72 (post-*Tyler* lawsuit also voluntarily

dismissing New York State). Based on this Court's review, the State is not a party to any of the

other post-*Tyler* lawsuits pending in this state. *See, e.g., Polizzi*, 720 F. Supp. 3d at 145 (suit

against County and its officials); *Bose v. Cnty. of Dutchess*, No. 24 Civ. 1333 (S.D.N.Y. 2024)

(same); *Vaughn v. Cnty. of Washington*, No. 24 Civ. 327 (N.D.N.Y. 2024) (same); *Deandrea v. Cnty. of Otsego*, No. 24 Civ. 287 (N.D.N.Y. 2024) (same); *Vose v. Cnty. of Fulton*, 24 Civ. 281 (N.D.N.Y. 2024) (same); *White v. Cnty. of Rensselaer*, No. 24 Civ. 280 (N.D.N.Y. 2024) (same); *Armer v. Cnty. of Montgomery*, No. 24 Civ. 259 (N.D.N.Y. 2024) (same); *Feimann v. Cnty. of Clinton*, No. 24 Civ. 257 (N.D.N.Y. 2024) (same); *Sitts v. Cnty. of Saratoga*, No. 23 Civ. 1649 (N.D.N.Y. 2023) (same); *Beutel v. Cnty. of Jefferson*, No. 23 Civ. 1603 (N.D.N.Y. 2023) (same); *see also Tyler*, 598 U.S. at 636; Pl. Br. at 12 ("[T]here are numerous other surplus cases pending in . . . the four New York districts; the State is not presently a party in any of those cases[.]").

Also defeating the County's motion for dismissal on this ground, the State has chosen not to intervene in this—or any—pending post-*Tyler* lawsuit, despite its notice and (from the County's theory) ostensible interest in them. *See* Pl. Br. at 10 ("[T]he State has affirmatively declared its intent not to participate in the[se] matters[.]"). For Rule 19(a)(2) to apply, the non-party at issue must assert an interest in the specific dispute. *See ConnTech Dev. Co. v. Univ. of Connecticut Educ. Props., Inc.*, 102 F.3d 677, 682–83 (2d Cir. 1996) (affirming denial of motion to dismiss on nonjoinder grounds, where non-party "clearly declined to claim an interest in the subject matter of this dispute"); *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 49 (2d Cir. 1996) (same). In one such post-*Tyler* case, the State even declined to participate notwithstanding that plaintiffs' claims included a constitutional challenge to provisions of the RPTL.[9] And plaintiffs here do not challenge the validity of a statute. They merely seek damage for the absence of just compensation for the excess funds yielded by the foreclosure sales of their particular properties.

---

[9] *See Merckx v. Rensselaer Cnty.*, No. 23 Civ. 1354 (N.D.N.Y), Dkt. 143 (giving New York Attorney General notice, under Federal Rule of Civil Procedure 5.1, of this challenge).

The County next argues that it is financially strapped and notes that, if it is held liable, it will need to muster "the financial resources necessary to fund and pay such damages." Def. Br. at 25. As a basis for dismissal on any ground—including under Rules 12(b)(7) or 19(a)—that argument is frivolous. The County, despite being asked for case authority, has not identified any holding that a unit of government may defend against—let alone obtain the pretrial dismissal of—a § 1983 claim that it violated a person's constitutional rights on the grounds that it would prefer not to repurpose or raise funds to pay damages. *Compare* Tr. at 23–27, 40 (seeking case authority), *with* Def. Br. at 17 (responding only that, if found liable, the Count would be obliged to raise taxes or issue debt). The Supreme Court in *Tyler* held in no uncertain terms that a county's retention of the surplus funds from a foreclosure sale violates the Takings Clause requirement of just compensation. Dismissal based on a county's reluctance to raise funds to compensate the victims of such constitutional violations would flagrantly breach the Supreme Court's command in *Tyler*.

The Court accordingly denies the motion to dismiss under Rule 12(b)(7). The State is not a necessary party, and its joinder is not mandatory under Rule 19. *See, e.g.*, *MasterCard Int'l*, 471 F.3d at 385–89 (affirming denial of motion to dismiss under Rule 19); *ConnTech Dev.*, 102 F.3d at 682–83 (affirming finding that Connecticut was not a necessary party "because its absence w[ould] not deny complete relief to the parties," "d[id] not claim 'an interest relating to the subject of the action,'" and "clearly declined to claim an interest in the subject matter of this dispute"); *Granda*, 2019 WL 367983, at *12 (denying motion to dismiss for failure to join necessary parties); *Garner v. Behrman Bros. IV, LLC*, 260 F. Supp. 3d 369, 382 (S.D.N.Y. 2017) (same); *Fed. Ins. Co. v. SafeNet, Inc.*, 758 F. Supp. 2d 251, 260–61 (S.D.N.Y. 2010) (same).

## CONCLUSION

For the foregoing reasons, the Court denies the County's motions to dismiss. The Clerk of Court is respectfully directed to terminate the motion pending at Docket 75.


SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: May 8, 2025
      New York, New York

23