UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GLORIA CAVALUZZI *et al.*,

                      Plaintiffs,

        -v-

COUNTY OF SULLIVAN,

                    Defendant.

23 Civ. 11067 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

In *Tyler v. Hennepin County*, 598 U.S. 631 (2023), the Supreme Court held that a county could be liable under 42 U.S.C. § 1983 for violating the Fifth Amendment of the Constitution where, after foreclosing on and selling a taxpayer's real property in order to extinguish her property tax debt, it kept for itself the excess proceeds of such sale. The 25 plaintiffs in this case, brought shortly after the *Tyler* decision, bring similar claims, asserting that New York's Sullivan County ("the County") violated the Fifth Amendment's Takings Clause, applicable to the states through the Fourteenth Amendment, by keeping tax foreclosure proceeds in excess of the amount necessary to pay plaintiffs' outstanding property taxes, interest, and penalties. Based on the same conduct, the plaintiffs also claim violations of the Eighth Amendment's Excessive Fines Clause and unjust enrichment under New York state law.

After two decisions denying motions to dismiss,[1] voluntary dismissals by two plaintiffs, and fact discovery, the parties now move for summary judgment. The 23 remaining plaintiffs

---

[1] *See Cavaluzzi v. County of Sullivan*, 2024 WL 5238644, at *1–4 (Dec. 27, 2024) ("*Cavaluzzi I*"), and 2025 WL 1347142, at *2–4 (May 8, 2025) ("*Cavaluzzi II*").

move for summary judgment  on all claims.  The County cross-moves for summary judgment on all claims.

The Court finds as follows:

On the § 1983 claims based on the Takings Clause, the Court grants summary judgment in favor of 15 of the 23 plaintiffs.  As to the remaining eight plaintiffs, the Court grants the County's summary judgment motion because these claims are untimely.

On the § 1983 claims based on the Excessive Fines Clause, the Court elects not to reach—and dismisses without prejudice—the claims of the 15 plaintiffs who prevailed on their § 1983 Takings Clause claims, on the ground that the Excessive Fines claims, if cognizable, are coextensive with, and seek the same remedy as, the Takings Clause claims.  As to the eight remaining plaintiffs, the Court grants the County's summary judgment motion on these claims because they are untimely.

On the unjust enrichment claims, the Court grants the County's summary judgment motion, because, as a matter of law, these claims are duplicative of the Takings Clause claims.

The Court denies all other summary judgment motions (*i.e.*, on counts as to which judgment is being entered for the opposing party).

On the one outstanding issue—tabulation of the damages due to the 15 prevailing plaintiffs on their § 1983 claims—the Court commissions supplemental briefing on a discrete methodological point.

## I.    Background[2]

### A.    The *Tyler* Decision

The Supreme Court's decision in *Tyler* issued on May 25, 2023.  Plaintiff Geraldine

Tyler owned a condominium in Hennepin County, Minnesota, on which about $15,000 in unpaid

property taxes, interest, and penalties had accumulated.  598 U.S. at 634–35.  The County, acting

under Minnesota's forfeiture procedures, seized Tyler's condominium and sold it for $40,000,

extinguishing her outstanding debt.  *Id*. at 635.  Rather than return the remaining $25,000,

Hennepin County kept the surplus for its own use.  *Id*.  Such was authorized by that county's tax

statute, which provided that the county could obtain a judgment against the property of a

delinquent taxpayer, transferring limited title to the state, and thereby sell the property.  *Id*.  After

the sale, "any proceeds in excess of the tax debt and the costs of the sale remain[ed] with the

---

[2] The Court draws its account of the underlying facts of this case from the parties' submissions on the competing motions.  These include: (1) in support of the County's motion for partial summary judgment, the County's memorandum of law, Dkt. 111 ("Cnty. Mem."), supporting declarations—Dkt. 109 ("Bullard Decl.") and Dkt. 110 ("Buck Decl.")—and numerous attached exhibits; (2) in support of plaintiffs' motion for summary judgment, Dkt. 112-1 ("Pls.' Mem."), and in opposition to the County's motion, Dkt. 113 ("Pls.' Opp'n"), supporting declaration, and numerous exhibits; (3) in opposition to plaintiffs' motion, Dkt. 114 ("Cnty. Opp'n"), supporting declaration, and exhibits, Dkts. 115–16, and in further support of its motion, the County's reply memorandum, Dkt. 119 ("Cnty. Reply"), supporting declaration, and exhibits, Dkt. 118; (4) in further support of plaintiffs' motion, plaintiffs reply, Dkt. 120 ("Pls.' Reply"); and (5) letters from the parties, *inter alia*, Dkts. 126–27, 130–31.  The Court also draws on the parties' joint stipulated facts, Dkt. 106 ("JSF"), and their individual Rule 56.1 statements, Dkt. 117 ("Pls.' SMF"), Dkt. 121 ("County SMF").

Citations to a party's Rule 56.1 statement incorporate by reference the materials cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and disputed with a conclusory statement absent conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

[c]ounty, to be split between it, the town, and the school district." *Id.* In 2020, Tyler filed a putative class action against Hennepin County and its officials. *Tyler v. Hennepin County*, No. 20 Civ. 889 (D. Minn. April 7, 2020), Dkt. 1. She claimed that, in retaining the surplus, the county had violated the Takings Clause and the Excessive Fines Clause. *Tyler*, 598 at 635–36.

Ruling on the Takings Clause claim, the Supreme Court unanimously held that a county cannot retain surplus money from the sale of foreclosed property to satisfy a delinquent property tax debt, without providing the taxpayer an opportunity to recover the surplus. *Id.* at 639–40. Doing so, it held, effected a "classic taking in which the government directly appropriates private property for its own use" without just compensation. *Id.* at 639 (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 324 (2002)). The Court recognized that Hennepin County "had the power to sell Tyler's home to recover the unpaid property taxes." *Id.* But, it held, the county "could not use the toehold of the tax debt to confiscate more property than was due." *Id.* The Takings Clause, it explained, "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Id.* at 647 (citation omitted). And a taxpayer "must render unto Caesar what is Caesar's, but no more." *Id.*

The Court held, however, that where state law "defin[es] [a] process through which the owner could claim the surplus," such would not offend the Takings Clause, because the state had made available a means to secure just compensation. *Id.* at 644 (citing *Nelson v. City of New York*, 352 U.S. 103, 110 (1956)). Minnesota law, however, lacked any such mechanism for recovery. *Id.* at 644–45.[3]

---

[3] The Court's majority did not decide whether Tyler had plausibly alleged an excessive fine under the Eighth Amendment. *Id.* at 647–48. Concurring, Justices Gorsuch and Jackson stated

**B.**      **Effect of *Tyler* on New York's Statutory Scheme**

As the Supreme Court recognized in *Tyler*, numerous states at the time, including New York, did not provide "opportunit[ies] for the taxpayer to recover the excess value from the State" after delinquent property sales. *Id*. at 632. After *Tyler*, courts invalidated aspects of the tax foreclosure schemes of several states for failing to provide mechanisms by which a taxpayer could pursue just compensation, while in others, the existing framework was upheld as consistent with *Tyler*. *See Cavaluzzi I*, 2024 WL 5238644, at \*2 (citations omitted). Various states modified their statutory schemes in light of *Tyler*. *See id*. (citations omitted).

New York was among the states to modify its statutory scheme in light of *Tyler*. In *Cavaluzzi I*, this Court summarized the State's pre-*Tyler* scheme:

> New York counties assess taxes on property every year, in accordance with the New York State Real Property Tax Law. *See* N.Y. Real Prop. Tax Law § 900 *et seq*. The taxpayer has one year to pay before the taxes become delinquent. *Id.* §§ 902, 1102(4). A municipality may enforce the payment of a delinquent tax by placing a tax lien on the affected property. *Id.* §§ 1102(3), 1104. If the taxpayer does not pay within the first month after the lien date, the tax accrues interest and penalties. *Id.* § 924. Generally, the delinquent taxpayer has two years to redeem the property and regain title by paying all outstanding taxes, fees, and penalties. *Id.* § 1110. If, however, the taxpayer does not satisfy the amount due, absolute title vests in the State, and the tax debt is extinguished. *Id.* § 1136(3). The State may keep the property for public use or sell it to a private party. *Id.* § 1190.
>
> As of the *Tyler* decision in 2023, Article 11 of New York State's Real Property Tax Law authorized the taxing authorities to retain the surplus proceeds from the sales of tax delinquent properties. *See id.* §§ 1190, 1194.

*See id.* at \*1.

On April 23, 2024, New York Governor Kathy Hochul signed into law an amendment to Article 11 of the New York State Real Property Tax Law ("RPTL"), providing "an unconditional claim for surplus equity," but only for those whose properties were "sold on or after May 25,

---

that Tyler might have a viable such claim, to the extent that Minnesota's tax foreclosure scheme produced fines that were partly punitive in nature. *Id.* at 648–50 (Gorsuch, J., concurring).

2023." *Sikorsky v. City of Newburgh*, 136 F.4th 56, 61 (2d Cir. 2025) (quoting 2024 N.Y. Sess. Laws ch. 55, pt. BB § 19(1)(A)).  The revised Article 11 puts in place a process by which an owner can claim and pursue a surplus from a sale of tax-foreclosed property.  *Id.*  Specifically, it provides:

> Any person who had any right, title, interest, claim lien or equity of redemption in or upon a parcel immediately prior to the issuance of the judgment of foreclosure may file a claim with the court having jurisdiction for a share of any surplus resulting from the sale of such property.  Such claims shall be administered and adjudicated, and such surplus shall be distributed, in the same manner as in an action to foreclose a mortgage pursuant to [A]rticle [13] of the real property actions and proceedings law, subject to the provisions of this section.

2024 N.Y. Sess. Laws ch. 55, pt. BB § 15 (adding RPTL § 1197).[4]  However, when the foreclosure concerns residential property, "[i]f at the time of the confirmation of the report of sale, no former homeowner has filed a claim for surplus, and there are surplus proceeds that remain to be distributed, the proceeding shall remain open for at least three years[.]"  RPTL § 1197(4).  After this period, any unclaimed surplus funds "shall be deemed abandoned" and "shall be paid to the tax district . . . to reduce its tax levy."  *Id.* § 1197(5).

Important here, New York's legislative fix in response to *Tyler* had limited retroactive application.  As the Court summarized in *Cavaluzzi I*:

> In general, [the amendment] applies only to sales of tax-foreclosed property "on or after May 25, 2023," the date the Supreme Court decided *Tyler*.  *Id.* § 19; *see also Matter of Seelbach*, 218 N.Y.S.3d 200, 213 (N.Y. Sup. Ct. 2024) ("[T]he Legislature made Part BB retroactive to *Tyler*'s 2023 decision date (*see* L 2024, ch 55, pt BB, § 19)—potent if not conclusive proof that the Legislature intended Part BB to cure the RPTL Article 11 system's legal uncertainty under *Tyler*."

---

[4] Under Article 13, "[a]ny person claiming the surplus moneys arising upon the sale of mortgaged premises, . . . at any time *before* the confirmation of the report of sale, may file with the clerk in whose office the report of sale is filed, a written notice of such claim, stating the nature and extent of his claim and [his] address."  N.Y. Real Prop. Actions L. § 1361 (emphasis added).  Within three months of a motion for confirmation, the court "shall ascertain and report the amount due to him or any person who has a lien on such surplus moneys, and the priority of the several liens thereon and order distribution of surplus moneys."  *Id.*

(citation omitted)).  For properties sold before May 25, 2023, a taxpayer [could] pursue a claim for the surplus on such sale only if he or she had timely initiated a proceeding to compel the "tax district to distribute such surplus" pursuant to Article 78 of the New York Civil Practice Law and Rules,[5] and if that proceeding remained active as of April 20, 2024.  *Id.* § 19.  Article 78 provides a mechanism to challenge as unlawful a decision by a New York State official or administrative agency.  *See* N.Y. C.P.L.R. 7803(1).

*Cavaluzzi I*, at *3.  Thus, where a tax-foreclosed property was sold before May 25, 2023, a claim for surplus attributable to such sale could be maintained if and only if a proceeding to compel such a county to distribute such surplus to the petitioner or petitioners had been initiated pursuant to Article 78 and this proceeding remained active on April 20, 2024.  *See Matter of Foreclosure of Certain Tax Liens Pursuant to Article 11, Title 3 of Real Prop. Tax L. by Cnty. of Schoharie*, 2025 WL 3685235, at *1 (Schoharie County Ct. Nov. 5, 2025) ("*Matter of Foreclosure of Certain Tax Liens*").  Property owners who do not satisfy these statutory conditions are ineligible for relief under New York law.  *Sikorsky*, 136 F.4th at 61.

### C.    History of This Litigation

#### 1. Overview of Plaintiffs' Claims

Plaintiffs filed this lawsuit on December 5, 2023.  Dkt. 1 ("Complaint").  The plaintiffs today comprise 23 current or former property owners in the County.  JSF ¶¶ II.2–5.[6]

---

[5] Article 78 provides a mechanism to challenge as unlawful a decision by a New York State official or administrative agency.  *See* New York Civil Practice Law and Rules ("N.Y. C.P.L.R.") § 7803(1).

[6] Plaintiffs' Amended Complaint ("AC") included two plaintiffs, Randy and Elizabeth Kleingardner, whose property the County sold at a tax-foreclosure auction on or about September 27, 2023, *i.e.*, after the effective date of New York's post-*Tyler* amendment to Article 11.  AC ¶ 39.  On September 17, 2024, the Kleingardners voluntarily dismissed their claims in this action, in favor of pursuing the administrative remedy supplied by the amended Article 11.  *See* Dkts. 51–52.

Each plaintiff brings a § 1983 claim against the County based on the Takings Clause arising from a property sale that fell outside New York's remedial amendment to Article 11 in response to *Tyler*. Specifically, each claim arises from the County's foreclosure and sale, pursuant to state law, of a parcel of land owned by a plaintiff who had failed to pay local property taxes. *Id.* ¶¶ II.1–6. The properties underlying each claim were foreclosed upon between February 20, 2019 and March 22, 2023, *i.e.*, before the *Tyler* decision. *Id.* The County sold these properties to third-party purchasers for a price exceeding the plaintiffs' tax debt, interest, and penalties, generating a surplus, which the County retained. *Id.* ¶¶ III.40, 49, 59, 69, 79, 89; Pls.' SMF ¶¶ 26–35, 37–45, 48–56, 59–68, 70–76, 78–79, 81–88, 90, 92–99, 101, 103–10, 114–21, 125–33, 136–44, 147–55, 158–66, 169–77, 180–88, 191–99, 202–10. None of the plaintiffs, as of April 20, 2024, had initiated an Article 78 proceeding seeking relief. *Cavaluzzi I*, 2024 WL 5238644, at *6. They pursue relief here, in recognition that, under *Tyler*, where a taxpayer "lacks a local remedy" for a county's retention of a tax surplus, a § 1983 claim based on the Takings Clause is available to "fill[] the gap." *Sikorsky*, 136 F.4th at 61.

Because several plaintiffs co-own properties, the 23 plaintiffs collectively bring a total of 19 claims, each keyed to distinct properties.[7] JSF ¶ II.1–3. The surpluses range from approximately $10,000, *id.* ¶ III.9, to $250,000, *id.* ¶ III.18, and average $51,000.

### 2.    The County's Initial Motion to Dismiss

On March 8, 2024, the County moved to dismiss the initial complaint, Dkts. 18–20, and, on April 18, 2024, after plaintiffs filed an amended complaint ("AC"), the County filed a new

---

[7] Some plaintiffs bring more than one claim, arising from the foreclosure of more than one parcel of land they owned. For example, Pasquale and Caterina Coviello bring two claims: one for the foreclosure of their property identified at Tax Map 16.6-6 and one for the foreclosure of their property identified at Tax Map 16-.6-5. Pls' SMF ¶ 147.

such motion, Dkts. 25–27.  The County argued that, under Rule 12(b)(1), (i) plaintiffs' claims were not ripe for adjudication at the time the AC was filed; and (ii) New York's amendment of Article 11 to create a statutory remedy for taxpayers to reclaim surplus funds had mooted their claims.  *Cavaluzzi I*, 2024 WL 5238644, at *4.  It separately argued, under Rule 12(b)(6), for dismissal of certain claims as untimely.  *Id.* at 7.

On December 27, 2024, the Court denied the motion to dismiss.  It found plaintiffs' § 1983 claims based on the Takings Clause ripe and not moot.  *Id.* at *4.  These claims, it noted, were "on all fours with those in *Tyler*."  *Id.* at *5.  The AC pled, with specificity as to each plaintiff, "that the County in fact [had] sold their property and retained the excess value above their tax debts."  *Id*.  And the legislature's adoption of Article 11 had not mooted plaintiffs' claims, because the amendment did not offer the plaintiffs a vehicle to pursue the surplus proceeds withheld from them.  *Id.* at *6.  Thus, "the County's claim that this amendment moots [the plaintiffs'] claims [did] not logically follow."  *Id.*

The Court also denied the motion to dismiss plaintiffs' § 1983 Taking Clause claims as untimely.  *Id.* at *7.  The parties, the Court noted, did not agree on the events that could trigger the limitations period to run.  *Id.* at *8.  The County argued for the date the foreclosed properties had been auctioned.  *Id.*  Plaintiffs countered that the limitations period should not run until the deed to the new owner had been filed with the County clerk and the surplus payment had been received by the County and not furnished to plaintiffs.  *Id.*  And the AC had not pled—and plaintiffs denied knowledge of—the latter date.  *Id.* at *9.  The "dates the County was paid the proceeds from the sales of their property," they argued, required discovery.  *Id.* at *8.  The Court agreed.  *Id.* at *9.  It noted that there was limited post-*Tyler* case law on the accrual date; that plaintiffs' theory was viable that "the takings claim should be keyed to the date when the County

came into possession of the surplus without transferring it to the taxpayer"; and that discovery was needed on this point. *Id.* at *8.

### 3.    The County's Second Motion to Dismiss

On May 8, 2025, the Court denied the County's second motion to dismiss, which had made two additional arguments. *Cavaluzzi II*, 2025 WL 1347142, at *1.

The County had argued that plaintiffs' claims presented a nonjusticiable political question, requiring dismissal for lack of subject matter jurisdiction. *Id.* at *4. The Court held, however, that defendants' arguments had not cleared the "high bar" for nonjusticiability, because "the fact that a plaintiff is seeking to hold a government unit liable, and obliged to pay damages, for an unconstitutional practice authorized by state law does not trigger the political question doctrine." *Id.* at *5 (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 321 (2d Cir. 2009); and then citing *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196–97 (2012)).

The County separately argued that plaintiffs had improperly failed to join New York State, which it contended was a necessary party, because the State had purportedly compelled the County to retain the surpluses while purportedly denying the County the opportunity to opt out of the pre-*Tyler* tax collection regime. *Id.* at *8. The County cited Chapter 602 of the Laws of 1993 ( "the 1993 legislation") as purportedly creating a mandatory scheme which counties could not avoid. *Id.* "For multiple reasons," the Court held, "that argument fail[ed]." *Id.* at *9. Principally, the Court observed:

> [T]he County's factual premise that Article 11 obliged, as opposed to authorized, it to retain forfeiture proceeds in excess of the property-owner's tax delinquency, is far from clearly correct. But even if it were, the choice to adopt such a statutory scheme, as reviewed above, was the County's. Sullivan County had been at liberty through 1993 to adopt its own statutory scheme governing forfeiture proceedings, but unlike many other counties, it chose not to do so.

10

*Id.*

### 4.    Discovery

Between February 7 and April 30, 2025, the parties conducted fact discovery.  Dkt. 71 ("Case Management Plan").  The County produced, with respect to the foreclosures at issue, records including foreclosure complaints, final orders of foreclosure, tax deeds, deeds from the County to third parties who purchased the properties ("Third-Party Deeds"), and financial records from foreclosure sales.  Pls.' Mem. at 7 n.1.  It also produced a report estimating the foreclosure surplus based on title reports and auction results.  May 27, 2025 Tr. at 20–21; Dkt. 112-3 at 19–20 ("Gains Report").  The parties also conducted 10 depositions.  JSF ¶ IV; May 27, 2025 Tr. at 7–8.  Deponents included the County's treasurer during the period of the foreclosure sales and numerous plaintiffs.  JSF ¶ IV; Pls.' SMF ¶ 10.

### 5.    The Pending Cross-Motions for Summary Judgment

On July 9, 2025, the County moved for summary judgment, making five arguments.  Dkts. 108–111.  First, that plaintiffs' claims are untimely.  Cnty. Mem. at 14–16.  Second, that plaintiffs cannot establish that the County "caused" the alleged takings because it did not have the ability to opt out of New York's pre-*Tyler* tax scheme.  *Id*. at 16–19.  Third, that *Tyler* does not apply to the foreclosure sales of investment property.  *Id*. at 20–24.  Fourth, that plaintiffs' unjust enrichment and Excessive Fines claims duplicate their § 1983 Takings Clause claims.  *Id*. at 25–26.  Fifth, that plaintiffs failed to file notice as to their state claims under General Municipal Law ("GML") § 50–e, requiring their dismissal.  *Id*. at 27–28.

On July 10, 2025, plaintiffs cross-moved for summary judgment.  Pls.' Mem. at 2.  They argued that, on the undisputed facts, the County is liable for unconstitutional takings of foreclosure surpluses under § 1983, because it consciously adopted and implemented a policy of

retaining these surpluses and has continued to hold them. *Id*. at 8–13. They also argued that their unjust enrichment claims are distinct from and can survive alongside their § 1983 claims and are established by the undisputed facts. *Id.* at 13–23. Finally, they conceded that the § 1983 claims of four plaintiffs are untimely, *id.* at 29–30, but argued that these plaintiffs' claims of unjust enrichment are timely, *id* at 30.

## II.    Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating that no genuine issue respecting any material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017). In making this determination, the Court must view all facts "in the light most favorable" to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (cleaned up).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (cleaned up). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. In determining

whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.    Plaintiffs' § 1983 Claims Based on the Takings Clause

To establish a § 1983 claim, a plaintiff must prove that a person acting under color of state law deprived her of rights secured by the Constitution or federal law. *See Gomez v. Toledo*, 446 U.S. 635, 638–40 (1980); *Zherka v. Amicone*, 634 F.3d 642, 644 (2d Cir. 2011) (citing *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) (per curiam)); *Bloom v. Town of New Windsor Police Dep't*, 234 F.3d 1261, 1261 (2d Cir. 2000) (summary order).

A county may be found liable under § 1983 if its policy, custom, or practice caused the violation of plaintiffs' rights. *See Monell v. Dep't of Soc. Servs*, 436 U.S. 658, 690–92 (1978); *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003); *Davis v. Town of Hempstead*, 208 F.3d 202, 202 (2d Cir. 2000) (summary order); *Harper v. City of New York*, 424 F. App'x 36, 37–38 (2d Cir. 2011) (summary order). Where the alleged violation stems from a county's administration of state law, a county may nonetheless be liable if the state law authorized it to perform certain actions but stopped short of mandating that it do so. *Vives v. City of New York*, 524 F.3d 346, 351 (2d Cir. 2008). Where a county both (1) had a "meaningful choice" as to whether it should enforce state law and (2) demonstrated a "conscious choice" in adopting a policy to enforce such a law, it may be found liable for administering a state law. *Id*. at 353–57; *see also Juzumas v. Nassau County*, 33 F.4th 681, 688 (2d Cir. 2022).

Here, plaintiffs claim, under § 1983, that the County violated their rights under the Fifth Amendment to be free from a taking of property without just compensation. The facts bearing

13

on that claim are essentially undisputed.  They definitively establish that each plaintiff's property was taken by a governmental unit without just compensation, and with no process available to obtain such compensation.  Specifically, the parties have stipulated that:

- the County, acting pursuant to state tax law, foreclosed on and auctioned each plaintiff's real property, JSF ¶¶ II.1–5;

- each auction generated receipts that exceeded the plaintiff's tax debt and penalties, *id.* ¶¶ III.1–89;

- the County retained these surpluses, *id.* ¶¶ III.40, 49, 59, 69, 79, 89; Pls.' SMF ¶¶ 26–35, 37–45, 48–56, 59–68, 70–76, 78–79, 81–88, 90, 92–99, 101, 103–10, 114–21, 125–33, 136–44, 147–55, 158–66, 169–77, 180–88, 191–99, 202–10; and,

- the plaintiffs do not have any recourse under New York law for relief, because they had not timely brought a pre-*Tyler* Article 78 action to compel the distribution to them of the surpluses, and because the Article 11 administrative remedy that New York adopted after *Tyler* otherwise applies only to properties sold after May 25, 2023.  *See* JSF ¶¶ III.1–89.

In numerous post-*Tyler* cases, facts consistent with these have established the liability of governmental units under § 1983 for a Takings Clause violation.  *See, e.g.*, *Sikorsky*, 136 F.4th at 61; *Freed v. Thomas*, 81 F.4th 655, 661 (6th Cir. 2023); *Matter of Seelbach*, 218 N.Y.S.3d at 210–213; *Sevinsky v. County of Cattaraugus*, No. 24 Civ. 186, 2025 WL 1400724, at *6 (W.D.N.Y. Apr. 8, 2025); *Polizzi v. County of Schoharie*, 720 F. Supp. 3d 141, 150 (N.D.N.Y. 2024); *Woodbridge v. City of Greenfield*, 23 Civ. 30093, 2024 WL 2785052, at *7 (D. Mass. May 29, 2024).  Here, the undisputed facts would similarly appear to establish the

14

County's liability under *Tyler*, warranting entry of summary judgment in plaintiffs' favor on their § 1983 claims under the Takings Clause and denial of the County's reciprocal motion.

The County, however, makes two primary arguments in opposition.

First, it argues, New York State's pre-*Tyler* statutory regime forced the County to retain the foreclosure surpluses from plaintiffs' properties, and the State never gave the County an opportunity to opt out of that regime. *See* Cnty. Mem. at 17–19.  Thus, the County argues, it did not cause the Takings Clause violations, and to the extent a "policy, custom, or practice" did so, it was the State's, not the County's. *Id.* at 18–19.  Second, it argues, plaintiffs' claims are untimely, having been brought outside the three-year limitations period for § 1983 claims.  Cnty. Mem. at 14–16.  The Court considers these arguments in turn.

### A.    Did the County Cause the Unconstitutional Taking?

Disputing the element of causation, the County argues that it was following binding state law, from which it could not opt out and which required it to retain the foreclosure surpluses from plaintiffs' properties.  For two reasons, that is wrong.

### 1.    Under State Law, the County Had the Discretion to Return Tax Surpluses

Most fundamentally, New York's comprehensive state-wide statutory scheme for the collection of delinquent property taxes ("Article 11" or "the 1993 legislation") did not *require* a county to retain the foreclosure surplus.[8]  RPTL § 1104 (McKinney 1993); *Cavaluzzi II*, 2025 WL 1347142, at *8 n.2.  It merely authorized it to do so.  The County does not adduce any support that Article 11 compelled counties to retain foreclosure surpluses.

---

[8] The 1993 legislation principally refers to enforcement by a "tax district," defined as counties and, under certain circumstances, cities and towns.  RPTL § 1102 (McKinney 1993) (defining "tax district").  For ease of reference, the Court hereinafter refers to the governmental unit at issue as "a county."

15

The "analysis begins, as always, with the statutory text." *United States v. Gonzales*, 520 U.S. 1, 4 (1997); *Moskal v. United States*, 498 U.S. 103, 108 (1990) (same). The text of Article 11, as amended in 1993 and 2003, reflects that it did not oblige a county to retain—rather than return to the taxpayer—a foreclosure surplus.

The critical provision is § 1190. *Cavaluzzi II*, 2025 WL 1347142, at *2 (citing § 1190 (McKinney 2003)). Setting out the process for foreclosing on delinquent tax liens, this section provides:

> Upon a sale of delinquent tax liens pursuant to this section, the enforcing officer shall issue and deliver to the purchaser one or more certificates identifying the affected parcels and the total amount due on each as of the date of the sale, including interest, penalties, and charges.

*Id.* § 1190(3). Section 1190(3) further directs the enforcing officer, or county treasurer, to perform certain tasks upon the sale. *Id.*; *id.* § 1102(3)(i) (defining "[e]nforcing officer"). The county treasurer is to "retain a copy of each such certificate"; "maintain records" relevant to interested parties; and "update those records" relevant to interested parties, *e.g.* by generating a deed recording the transfer to a third-party buyer. *Id.* § 1190(3). Critically, § 1190 is silent as to the disposition of a foreclosure surplus—or any duties *after* the sale. *Id.* (stating that, after a foreclosure sale, a county "shall have no further rights or responsibilities relative to delinquent tax liens"). And the County does not point to any text in this section, or elsewhere, supporting that it was statutorily obliged to keep the surplus. The natural inference is that the County retained discretion as to whether to retain or remit the surplus.

Several surrounding provisions are instructive as to this point. Section 1194(7) of Article 11 addresses the duties of a county court with respect to the "proceeds of the sale" of tax liens encumbered by mortgages. It authorizes such a court to:

16

> determine and enforce in all respects the priorities, rights, claims and demands of the several parties to such action, including the priorities, rights, claims and demands of the defendants as between themselves, and to direct a sale of such real property and the *distribution or other disposition of the proceeds of the sale*

*Id.* § 1194(7) (emphasis added).  Had the New York legislature intended to mandate that a county retain the surplus, § 1194(7), in empowering a county to direct "the distribution or other disposition of the proceeds of a sale" of a mortgage-encumbered property, presumably would have included such a command.  It does not.

Revealing, too, is § 1194(9).  It addresses sales whose proceeds fall short of the amount necessary to cover a tax lien, and directs a county to distribute these in proportion to the sizes of the respective encumbrances on the property.  *Id.* § 1194(9).  The statute's directives as to a deficit scenario are in contrast to its silence with respect to the disposition of the proceeds where there is a surplus.  Legislatures "speak in plain terms" when they wish to circumscribe government action.  *City of Arlington v. F.C.C.*, 569 U.S. 290, 296 (2013).  The New York legislature's conspicuous silence as to the fate of surplus proceeds undermines any claim that the statute compelled the County to retain the foreclosure surpluses for itself.

The RPTL's treatment, in Article 9, of the surplus after foreclosure of a tax debtor's *personal* property is also instructive.  RPTL § 926 (McKinney 1978).  Section 926 obliges the State to return a surplus from a sale of personal property to the tax debtor, except where a competing claim to it has been made.  It provides:

> Any surplus from the proceeds of the sale after payment of the taxes due and the expenses of levy and sale shall be paid to the person liable for the taxes unless a claim therefor is made by some other person on the ground that the property sold belonged to him.  If the person liable for the taxes admits the validity of such claim, the surplus shall be paid to the person making the claim, otherwise it shall be paid to the chief fiscal officer of the city or town who shall retain the same until the rights of the parties have been determined in accordance with law or by agreement of the parties. Either party may bring an action against the other to recover such

17

> surplus and, for the purposes of the action, the defendant shall be deemed to be in possession thereof.

*Id.* § 926(4). There is no comparable provision in Article 11. The presence of such a comparable provision would undermine any argument by a property owner that the pre-*Tyler* statute obliged the County to pay the foreclosure surplus to her. But plaintiffs do not base their claim of entitlement to the surplus on the New York statute, but on the Takings Clause. *See* Pls.' Mem. at 6, 10–11. And the fact that Article 9 mandates the disposition of the proceeds of personal property foreclosures underscores that the New York legislature was capable of making a similar mandate with respect to real property. Article 11's silence on this point implicitly but clearly left the County with discretion as to foreclosures upon real property.

As to legislative history, because the statute is not ambiguous—it clearly did not restrict a county's latitude to retain or remit real property foreclosure surpluses—there is no basis for recourse to it. *See United States v. Dickerson*, 310 U.S. 554, 562 (1940); *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011) ("Legislative history . . . is meant to clear up ambiguity, not create it"). Regardless, the limited materials the County offers with respect to Article 11 as amended in 1993—which do not even consist of legislative records, but rather are operational materials generated within the executive branch between 1993 and 1995—do not support that the County was compelled to retain surpluses for itself. These materials are largely silent as to the retention of the surplus. And several affirmatively underscore the discretion a county had as to whether to retain such surpluses.[9]

---

[9] These materials largely fall into two categories: (i) executive branch summaries of the 1993 legislation, *see* Dkts. 110-3 through 110-5, 110-7, 110-8, and (ii) "Instruction Manual and Forms for the new tax enforcement program" prepared by a division of the executive branch, the Office of Real Property Services, *see* Dkts. 110-6, 110-9.

18

Post-*Tyler* courts have uniformly held that a county violates the Takings Clause when, exercising authority afforded by state law, it retains the surplus of a foreclosure sale. That includes two cases arising in New York State. *See Matter of Seelbach*, 218 N.Y.S.3d at 210 (noting Article 11 "*allowed* taxing authorities to retain surplus" (emphasis added)); *Polizzi*, 720 F. Supp. 3d at 148–49. It also includes numerous out-of-Circuit cases. *See Freed*, 81 F.4th at 661 (finding county's decision to "serve as the foreclosing governmental unit and retain the proceeds was a policy decision with a direct causal link to [plaintiffs']" Takings Clause violation (cleaned up)); *Bowles v. Sabree*, 121 F.4th 539, 556 (6th Cir. 2024) (same); *Wayside Church v.*

---

As to the first category, none of the memoranda even touch on the topic of surplus. Instead, these memoranda track and synopsize sections of Article 11 and provide updates as to technical amendments. A memo dated August 16, 1993 from the State's Division of Equalization and Assessment does not address "surplus" at all. *See* Dkt. 110-3 at 1–9 ("August 1993 Memo"). A memo from the State's Division of Equalization and Assessment to the County's treasurer dated September 17, 1993 summarizes the 1993 legislation, its background, and steps counties must undertake for its implementation, but is similarly silent as to the retention or distribution of any surplus. *See* Dkt. 110-4 ("September 1993 Memo") at 2–3. The Division of Equalization and Assessment's memo to the County's treasurer dated June 9, 1994 focuses exclusively on technical amendments to the 1993 legislation; it says nothing about any obligation as to a surplus. Dkt. 110-5 ("June 1994 Memo"). Finally, the Office of Real Property Services' memo of August 23, 1995 reports on legislative updates regarding "technical amendments" to the 1993 legislation, but does not address "surplus." Dkts. 110-8 ("August 1995 Memo"); Dkt. 110-7 ("1995 Technical Tax Enforcement Amendments Summary").

As to the second category—draft versions and finalized copies of "Tax Enforcement Forms and Manuals"—none command the County to retain the surplus proceeds from a tax foreclosure sale. *See* Dkts. 110-6 ("Draft Tax Enforcement Forms"), 110-9 ("Tax Enforcement Forms"). These model forms are focused on the notice, redemption, declaration of interest offered to a delinquent taxpayer. Draft Tax Enforcement Forms at 22–53; Tax Enforcement Forms at 26. The one document that addresses a surplus is an executive summary from the Division of Equalization and Assessment. It is undated but appears to have been generated around the time of the 1993 legislation. It states that under the amended legislation, "[t]he tax district would retain its right to keep any surplus resulting from the disposition of property acquired through tax enforcement proceedings," and "recommends" that a county "retain policies permitting" them to do so. *See* Dkt. 109-3 ("Undated Division of Equalization and Assessment Summary") at 5. That formulation underscores that a county was not obligated to retain a surplus but had the latitude to set its own policy as to such.

*Van Buren County*, 2025 WL 2829601, at *11–12 (6th Cir. Oct. 6, 2025) (Kethledge, J., concurring) (same); *Woodbridge v. City of Greenfield*, 2024 WL 2785052, at *5–6 (D. Mass. May 29, 2024) (noting that no case within the First Circuit has held that a municipal defendant can avoid liability for a *Tyler* takings claim by claiming to be merely following state law).

The Court therefore rejects the County's attempt to avoid § 1983 liability on the ground that state law compelled it to retain the foreclosure surpluses. That is demonstrably incorrect. The County's elective policy to do so exposes it to § 1983 liability for a taking. *See Juzumas*, 33 F.4th at 688 (county may be liable under § 1983 for enforcing state law where a statute "did not constitute a mandate" (cleaned up)); *Vives*, 524 F.3d at 354–57 (where a municipality exercises a meaningful and conscious choice in enforcing state law, it causes the violation of plaintiff's constitutional rights); *DePiero v. City of Macedonia*, 180 F.3d 770, 787 (6th Cir. 1999) (finding municipality liable under § 1983 where state statute involved discretionary decision over whether to take unconstitutional action).

### 2. The County Had the Opportunity to Opt Out of the 1993 Legislation That Purportedly Compelled It to Retain Foreclosure Surpluses

In arguing that the pre-*Tyler* tax foreclosure scheme compelled it to retain foreclosure surpluses, the County also contends that it had no opportunity to opt out of that scheme. That issue is moot here insofar as the County's depiction of that regime is wrong: as shown above, the amended statute gave counties the latitude *not* to retain surpluses. In the interest of completeness, the Court nonetheless addresses the County's argument that it had been denied the opportunity to opt of Article 11.[10] That argument is baseless, because it is clear that the County

---

[10] The County's argument to this end reprises its argument in its second motion to dismiss. *Compare* Dkt. 75-8 at 15–16, *with* Cnty. Mem. at 18–19 (identical paragraphs in second motion to dismiss and motion for summary judgment). The Court rejected that argument as meritless. *See Cavaluzzi II*, 2025 WL 1347142, at *9 ("At the outset, the County's factual premise that

had—but forewent—an opportunity to opt out of that legislation.  For that separate reason, the County's attempt to slough off responsibility for taking plaintiffs' surpluses fails.

The statutory text and history, reviewed below, reflects that the opportunity to opt out of Article 11 was not limited (as the County contends) to the 10 New York State counties that before 1993 had adopted their own tax foreclosure laws, but was available to all other counties, provided that these adopted their own tax charter by August 1, 1994.  RPTL § 1104.  It also reflects that Sullivan County forewent that opportunity, and affirmatively adopted the foreclosure procedures set out in the 1993 legislation.

On August 4, 1993, New York's legislature approved, and then-Governor Mario Cuomo signed into law, the amended RPTL, to take effect January 1, 1995.  RPTL § 8 (McKinney 1993).  The amended RPTL set out uniform rules governing all New York counties and "supersede[d] any inconsistent general, special or local law."  *Id.* § 1104(4).  Under Article 11, a county could adopt the amended RPTL by having its legislature elect to enforce tax delinquencies in accordance with the revised state law.  *Id.* § 1104(1).  To that end, Article 11 stated that "any tax district may elect" to ratify portions of the statute by having its local legislature adopt a "resolution" indicating it elected to "enforce the collection of delinquent taxes" as provided in Article 11.[11]

---

Article 11 obliged, as opposed to authorized, it to retain forfeiture proceeds in excess of the property-owner's tax delinquency, is far from clearly correct.").

[11] As to this point, § 1104 stated:

> 1. Resolved, that from and after .......... (here insert date), the .......... (here insert name of tax district) elects to adopt the provisions of title (s) .......... of article eleven of the Real Property Tax Law for the purpose of enforcing the collection of delinquent taxes in such tax district. Such resolution may be adopted by the governing body of such tax district and a certified copy thereof shall be filed in the office of the county clerk of the county or counties in which such tax district is

At the same time, Article 11 maintained a county's ability to enforce tax delinquencies under a statutory scheme of its own design.  Section 1104(2) gave a county the latitude to do so if:

> (i) on January first, nineteen hundred ninety-three, was authorized to enforce the collection of delinquent taxes pursuant to a county charter, city charter, administrative code or special law; (ii) adopted a local law, no later than July first, nineteen hundred ninety-four, providing that the collection of taxes in such county, city or town shall continue to be enforced pursuant to such charter, code or special law, as such charter, code or special law may from time to time be amended; and (iii) filed a copy of such local law with the commissioner no later than August first, nineteen hundred ninety-four.

RPTL § 1104(2).  The statute set out distinct mechanisms for counties to adopt their own tax delinquency laws depending on whether they already had such laws in place.[12]  Counties with such laws could opt out of amended Article 11 in favor of those existing laws, which the

---

situated prior to the commencement of the first foreclosure proceeding under this article.  Upon the adoption of such resolution, the provisions of the title or titles of this article designated therein shall become applicable to such tax district and in addition thereto the provisions of titles one and four of this article shall by operation of law become applicable to such tax district.

2. Any tax district after a period of at least one year from the adoption of such resolution may rescind such election by the adoption of a resolution to such effect, which resolution shall be adopted and filed in the same manner as the original resolution.  Upon the adoption of a rescinding resolution, the provisions of this article shall cease to be applicable to such tax district and the provisions of the laws in force therein prior to such election, relating to the foreclosure of tax liens, shall again become applicable to such district, together with any amendments to such laws.  Neither an election to adopt the provisions of this article or any part thereof, nor an election to rescind the same, shall affect any action or proceeding for foreclosure of a tax lien commenced prior to such election or rescission and such action or proceeding may be continued in the same manner as though such election or rescission had not been made

[12] A county that opted out could thereafter adopt the Article 11 procedures—*i.e.*, opt back in. RPTL § 1106 (McKinney 1994).

amended RPTL thus effectively permitted to be grandfathered. *Cavaluzzi II*, 2025 WL 1347142, at \*2. Counties that did not already possess their own tax foreclosure scheme could adopt their own such law before July 1, 1994, but after that date, did not have latitude to do so. *See* RPTL § 1104(2)(iii).[13] Under Section 1104, nine counties and numerous other units of local government elected to maintain, or adopt, their own tax systems, thus opting out of the amended RPTL.[14]

Before the 1993 legislation, Sullivan County had not had its own tax delinquency scheme; it had collected taxes pursuant to Article 10 of the RPTL, the statewide system then in place. Dkt. 110-2 ("Sullivan County Resolutions") at 1. The County thus fell into the category of counties that had the latitude to adopt their own tax delinquency laws, provided that they did so by July 1, 1994. The County did not do so. Instead, on December 10, 1992, months before New York State enacted amended Article 11 and over a year before the opt-out deadline, the County's legislature noted its approval of the proposed Article 11. *Id.* at 3. In a resolution, the County resolved to follow Article 11 "as soon as it is practical to do so" and directed its attorneys to "prepare the appropriate legal documents" to enact such a resolution. *Id.* On March

---

[13] Section 1104 provided that a county required "authoriz[ation]" to enact such a law. As the case law has clarified, that term required that a county's legislature have enacted a law to that effect. *Joel Friedberg Tr. v. Metaglo, Inc.,* 991 N.Y.S.2d 449, 449 (2d Dept. 2014) (the "same" 1993 legislation that repealed certain aspects of tax enforcement "authorized a village to adopt a local law" to empower it to adopt its own procedures governing tax foreclosures); *Cnty. Acquisitions, LLC v. Lanser*, 229 N.Y.S.3d 160, 163 (2d Dept. 2025) (same).

[14] The nine counties were Erie, Lewis, Livingston, Monroe, Nassau, Niagara, Oneida, Onondaga, and Suffolk. Tax Instructions and Forms at 23. Most already had their own tax delinquency statutes. September 1993 Memo at 3. Twenty-four cities, one town, and certain villages also opted out. 1995 Tax Instructions and Forms at 23.

11, 1993, a county legislator moved to adopt the provisions of amended Article 11. *Id.* at 2.

That day, the County Legislature enacted the following resolution:

> [T]hat pursuant to Section 1104 of the Real Property Tax Law, that from and after January 1, 1994, the County of Sullivan elects to adopt the provision of Title Three (3) of Article Eleven (11) of the Real Property Tax Law for the purpose of enforcing the collection of delinquent taxes in such tax district.

*Id.* The resolution noted the advantages of the new approach relative to the existing one under Article 10, under which it ordinarily took a county some five years to recover delinquent property taxes. *Id.* at 3.[15] The resolution stated that the 1993 legislation "provides a reasonable mechanism to not only reduce the period of time to one which is more reasonable and in the better interests of the County [], [and] also provides a procedure that results in a better quality of title to the County and henceforth to any purchaser from the County." *Id.* at 2.

In portraying itself as lacking the opportunity to opt out of the 1993 legislation, the County relies upon synopses of Article 11 circulated by the State's executive branch. It contends that these documents, circulated between 1993 and 1998, show that the ability to opt out was limited to counties with preexisting tax delinquency laws. Cnty. Mem. 12–14, 16–19. But these memoranda do not support that counties without preexisting statutory regimes could not opt out. They were silent on that point.[16] In all events, however it was characterized in these

---

[15] Article 10's inefficiencies stemmed, in part, from the administrative tax sale procedures it required. An entity which did not wish to sell a tax lien to a private speculator was required to going through the "formality of a tax sale to itself." Paul G. Mackey, *In Search of Due Process: Notice in New York Administrative Tax Sales*, 61 ST. JOHN'S L.R. 113, 115 n. 8 (citing RPTL § 1120(1) (McKinney 1987)).

[16] The August 1993 Memo, for example, stated that counties "would be permitted under § 1104 to 'opt-out' for a limited time," and described § 1104 as "provid[ing] for a uniform Statewide system, except for those jurisdictions that are now under their own systems and that 'opt-out' by July 1, 1994." August 1993 Memo at 4. Likewise, the September 1993 Memo stated that the "new law will automatically apply to all counties now enforcing taxes pursuant to Articles 10 or

24

memoranda, the statutory text of amended Article 11 clearly afforded all counties that right.  And the County cannot claim to have relied on these memoranda in deciding whether or not to adopt Article 11—it had already adopted Article 11 months earlier, on March 11, 1993.

The Court, therefore, rejects the County's argument that state law compelled it to adopt Article 11 in 1993.  The County chose to do so.  For this reason, too, the County's claim that it was compelled to retain the foreclosure surpluses fails.

With the County's arguments disclaiming its causation of the retention of the surpluses aside, there is no dispute of material fact as to any substantive element of plaintiffs' § 1983 claims based on the Takings Clause.[17]  The Court accordingly turns to the County's remaining defense: that plaintiffs' claims are untimely.

### B.    Are Plaintiffs' Claims Timely?

The County next argues that plaintiffs' § 1983 claims are time barred, whereas plaintiffs argue that, with the exception of four plaintiffs' claims, they are not.  Cnty. Mem. at 14–16; Pls.'

---

11," but that "those 10 counties with special acts relating to tax enforcement have a limited opportunity to adopt a local law 'opting-out' of the new program."  September 1993 Memo at 3.

[17] Two frivolous arguments by the County are quickly interred.   First, it argues, *Tyler* applies only to foreclosures involving a "primary residence," and thus claims arising from foreclosures of "commercial real estate" cannot stand.  Cnty. Mem. at 20.  Nothing in *Tyler* supports that limitation—and the condominium in *Tyler* was not Tyler's primary residence: Tyler herself had moved to a senior community in 2010, five years before the foreclosure.  598 U.S. at 635; *see also id*. at 647 (noting that Minnesota statute gave no weight to a taxpayer's use of the property).  Second, the County points to stipulations by plaintiffs' counsel in other cases, involving persons who are not parties here, to the effect that, before *Tyler*, the retention of foreclosure surpluses was "statutorily authorized."  Cnty. Opp'n at 24.  These stipulations do not bind plaintiffs here. *Guadagno v. Wallack Ader Levithan Assocs.*, 950 F. Supp. 1258, 1261 (S.D.N.Y.) ("stipulations by a party or its counsel . . . are binding upon *the party* making them" (emphasis added)), *aff'd*, 125 F.3d 844 (2d Cir. 1997).  And even if they did, they would not assist the County.  Whether undertaken pursuant to statute or otherwise, an unconstitutional taking by a county is still an unconstitutional taking. *Bowles*, 121 F.4th at 556 ("County expropriated property from [plaintiffs] and pocketed cash that it owed them in return.  In other contexts, we might call that 'theft.'").

25

Mem. at 28–29.  This determination turns on three methodological questions.  The parties agree

on the first: the length of the limitations period.  Cnty. Mem. at 14; Pls.' Mem. at 29.  They

disagree on the second (the circumstances under which a takings claims based on *Tyler* accrues)

and the third (whether the limitations period was tolled under Executive Order 202.8, which

tolled the commencement of legal actions in New York State between March and November

2020).  *See* Cnty. Mem. at 14–16; Cnty. Opp'n at 31–33; Pls.' Mem. at 26–30.

### 1.    Length of the Limitations Period

In § 1983 actions, the limitations period is supplied by state law.  *Wallace v. Kato*, 549

U.S. 384, 387 (2007).  Courts are to "apply the most appropriate or analogous statute of

limitations" under state law, so long as it is not inconsistent with federal law or policy.  *Kane v.*

*Mount Pleasant Cent. Sch. Dist.*, 80 F.4th 101, 107 (2d Cir. 2023) (cleaned up).  In § 1983

actions claiming violations of the Takings Clause, the Second Circuit has held, the applicable

statute of limitations is that of "personal injury actions under state law."  *Sikorsky*, 136 F.4th

at 63 (quoting *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013)).  As both sides agree,

plaintiffs' § 1983 claims are therefore subject to a limitations period of three years.  Cnty. Mem.

at 14; Pls.' Mem. at 29; New York Civil Practice Law and Rules ("N.Y. C.P.L.R.") § 214(5)

(McKinney 2021).

### 2.    Accrual Date of Plaintiffs' Claims

The accrual date of a § 1983 action is "governed by federal rules conforming in general

to common-law tort principles."  *Wallace*, 549 U.S. at 388.  Under these, accrual occurs when

the plaintiff has "a complete and present cause of action."  *Bay Area Laundry & Dry Cleaning*

*Pension Tr. Fund v. Ferbar Corp.*, 522 U.S. 192, 201 (1997); *see also California Pub. Emps.'*

*Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 505 (2017) ("the cause of action [accrues] . . . when the

plaintiff can file suit and obtain relief"); *Laureano v. Goord*, No. 06 Civ. 7845, 2007 WL

2826649, at *3 (S.D.N.Y. Aug. 31, 2007) ("Under federal law, a cause of action accrues when a plaintiff has a complete and present cause of action" (cleaned up)). Put differently, a § 1983 cause of action accrues "when the plaintiff knows or has reason to know of the injury which is the basis of [the] action." *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002) (cleaned up); *Singleton v. City of New York*, 632 F.2d 187, 191 (2d Cir. 1980) (same).

In *Sikorsky*, the Second Circuit addressed the then-open question of "when a claim for surplus equity under *Tyler* accrues." 136 F.4th at 62. The Circuit held that accrual begins at the point when a county retains the foreclosure surplus—because its retention of the surplus is what gave rise to the Takings Clause violation. *Id.* (citing *Tyler*, 598 U.S. at 643). As the Circuit explained, the "harm did not occur until the City received (and began to 'retain') the money from the sale of the property," which the plaintiff there alleged occurred in June 2021. *Id.* In the context of a foreclosure proceeding under the post-*Tyler* RPTL, the "sale" has been held to refer "a *sale resulting from a public auction* conducted in accordance with the provisions of [the RPTL]." *Matter of Foreclosure of Certain Tax Liens*, 2025 WL 3685235, at *2 (quoting RPTL § 1196 (McKinney 2023) (emphasis in original). Thus, under *Sikorsky*, an accrual begins at the point, following a public auction, that the County received the proceeds of that sale.

The County argues here that the accrual date is the date of the county court's judgment that authorized a foreclosure sale. Cnty. Mem. at 15 (urging use of the date "when the County by court order is awarded possession and clean title to allow auction of the [p]roperties"). That argument cannot be squared with *Sikorsky*. The date of the final judgment necessarily predated the auction date, and therefore necessarily predated the date when the County could begin to "receive" and "retain" the surplus from a sale. *Sikorsky*, 136 F.4th at 62. And the precedent on which the County relies, *Stensrud v. Rochester Genessee Reg'l Trans. Auth.*, 507 F. Supp. 3d

27

444, 452 (W.D.N.Y), predated *Tyler* by two years and *Sikorsky* by five. *See* Cnty. Mem. at 14–15 (citing *Stensrud*, 507 F. Supp. 3d at 451–52)). Plaintiffs are correct that the accrual date is instead the day the County received (and began to retain) the sale proceeds, which necessarily included the surplus. *See Sikorsky*, 136 F.4th at 62.

Determining that date, in the context of sales in Sullivan County, requires a review of the sequence of events associated with foreclosure actions in the County. The undisputed evidence supports that that process as to each property foreclosed upon on account of a property tax delinquency, entailed the following steps.

First, as the County's treasurer testified, the County conducted a title search to identify the property's last identified record holder. Dkt. 112-3 at 21–217 ("Buck Tr."); *id.* at 65, 69–70. Second, the County generated a petition and notice of foreclosure proceedings, which, as state law required, it posted publicly in numerous locations, and served on the property owner, among others. *Id*. at 144–45. Third, where there were no ensuing payments towards the delinquent taxes, the County filed a foreclosure lawsuit before a county court judge. *Id*. at 70–75. Fourth, after judgment was rendered by the county court, the County obtained a deed transferring the property from the former owner to the County ("Treasurer's Deed"). *Id*. at 75–76, 124. The parties have stipulated that, with respect to each property at issue, the County obtained a Treasurer's Deed before auctioning the property. JSF ¶¶ II.1–5. Fifth, the County placed the foreclosed properties for sale through an "auction company." Buck Tr. at 100–06. The auction company gave potential buyers a description of the property, identified as a parcel on the Tax Map, the outstanding tax debt, and a lot number. *Id.* at 82. Before the auction, the County gave the delinquent taxpayer a final opportunity to remove his parcel from auction by paying 10% of the outstanding taxes. *Id.* at 105–06. If the taxpayer thereupon paid 5% of the property's

valuation, she could repurchase it in full.  *Id*. at 106.  Sixth, where the property had not been removed from auction, the auction company administered the auction and awarded the property to the highest bidder.  *Id*. at 119.

The County did not, however, receive payment at the time of the auction.  *Id*. at 83, 110, 125–26.  After the auction, bidders had at least 30 to 45 days to complete payment.  *Id*. at 126.[18] And, as the County's treasurer testified, buyers often "do not follow through" with payment. *Id.* at 117.  For the County to secure payment from a third-party purchaser required two steps: that the purchaser (1) complete a form sent by the auction company and (2) thereafter, pay the County.  *Id*. at 119–20.  Once a bidder paid in full, a deed was thereupon executed to transfer the property from the County to the third-party purchaser, generating the Third-Party Deed. Pls.' SMF ¶ 17; Buck Tr. at 125–26.

The parties here have not adduced evidence—such as bank records—reflecting, for each property sold, the date when the County received the payment incorporating the surplus.[19]  But the record contains the Third-Party Deeds, each of which reflects the date on which it was generated.  JSF ¶ II.3.  There is no factual dispute as to the authenticity of these deeds or the accuracy of the dates on them.  *See id.*  And the undisputed evidence is that Third-Party Deeds issue coincident, or close in time, with the payment by the purchaser to the County.  In these

---

[18] The revised Article 11, post-*Tyler*, for example, provides that the County's treasurer has "forty-five days after the sale of the tax-foreclosed property" to determine "whether a surplus is attributable to such sale and if so, the amount thereof."  RPTL § 1196(1)(a) (McKinney 2023).

[19] At the conference to discuss the instant summary judgment motions, the Court inquired whether these dates had been identified in discovery.  *See* May 27, 2025 Tr. at 5–7.  Counsel stated that such dates had been identified as to some, but not all, of the property sales, *id.* at 7–9, and the Court directed counsel to include this information, where available, in their summary judgment filings, *id.* at 14.  Inexplicably, counsel did not do so.

circumstances, the issuance date of each Third-Party Deed is the best proxy for the date on which the County received the surplus payment.

With the issuance dates of the Third-Party deeds used as the accrual dates, the claims of 15 of the remaining 23 plaintiffs are timely.[20]  That is because each such plaintiff brings claims based on property as to which the Third-Party deed issued after December 5, 2020 (*i.e.*, within three years of the filing of this lawsuit).[21]

---

[20] These are: plaintiffs Lyndon Alleyne, Caterina Coviello, Pasquale Coviello, Roseanne Crumbley, Lisa DeMarinis, Harvey Edelgass, Lawrence Eisenberg, Steven Eisenberg, Kenny Emeigh, Louise Gorr, Richard Gorr, Tatiana Kozak, Thomas Prendergast, Joseph Szymczak as principal of Madlill Properties Corporation, and Amber Tsoucalas as Executrix of the Estate of Everett Tsoucalas.

[21] Lyndon Alleyne's property, identified at Tax Map No. 114-2-5.4, was conveyed to a third-party purchaser on December 22, 2020.  Pls.' SMF ¶¶ 125, 133.  Caterina and Pasquale Coviello's properties, identified at Tax Map Nos. 16.-6-5 and 16.-6-6, were conveyed to a third-party purchaser on January 27, 2023.  *Id*. ¶¶ 147, 154.  Roseanne Crumbley and Kenny Enmeigh's property, identified at Tax Map No. 2.-1-1.1, was conveyed to a third-party purchaser on December 15, 2020.  *Id*. ¶¶ 92, 99.  Lisa DeMarinis' property, identified by SBL No. 49.-12-6, was conveyed to a third-party purchaser on December 28, 2023.  *Id*. ¶¶ 158, 165.  Harvey Edelgass' property, identified at Tax Map No. 1.-1-58.2, was conveyed to a third-party purchaser on April 28, 2021.  *Id*. ¶¶ 37, 43.  Lawrence and Steven Eisenberg's properties, identified at Tax Map No. 4.-1-11 and 4-.1-20.2, were conveyed to a third-party purchaser on December 9, 2020.  *Id*. ¶¶ 48, 54.  Louise and Richard Gorr's property, identified at Tax Map No. 26.1-19, was conveyed to a third-party purchaser on January 27, 2023.  *Id*. ¶¶ 70, 76.  The Madlill Property Corporation's property, identified at Tax Map No. 28.-5-7, was conveyed to a third-party purchaser on January 5, 2023.  *Id*. ¶¶ 81, 88.  Tatiana Kozak's property, identified at SBL No. 57-1-16.04/0106, was conveyed to a third-party purchaser on December 28, 2022.  *Id*. ¶¶ 169, 176.  Thomas Prendergast's property, identified at SBL No. 16.-7-1.8, was conveyed to a third-party purchaser on January 27, 2023.  *Id*. ¶¶ 191, 198.  The Estate of Everette Tsoucalas' property, identified at Tax Map No. 38.12-12, 38.-12-2.2, and 38.-12-3, was conveyed to a third-party purchaser on December 7, 2023.  *Id*. ¶¶ 114, 120.

The accrual dates for the Estate of Everette Touscalas' property and the DeMarinis' property post-dated the filing of the Complaint, December 5, 2023, but pre-dated the filing of the AC. These plaintiffs' claims are timely because they initiated this suit within three years of the accrual date.

### 3.    Availability of Tolling Under Executive Order 202.8

Plaintiffs argue that the limitations period governing their claims was tolled by Executive Order 202.8 (the "Order"), which was issued in 2020 by then-Governor Andrew Cuomo, in light of COVID-19.  Pls.' Mem. at 27–29.  The defense disputes that the toll applies.  Cnty. Mem. at 30–33.  Although not for the reasons the defense articulates, the Court finds that the toll does not salvage any of the otherwise untimely claims in this case.

Tolling, in general, is governed by state law.  *Hardin v. Straub,* 490 U.S. 536, 539 (1989); *Board of Regents of Univ. of State of N.Y. v. Tomanio,* 446 U.S. 478, 484–87 (1980); *Rich v. New York*, No. 21 Civ. 3835, 2022 WL 992885, at *8 (S.D.N.Y. Mar. 31, 2022).  "A toll does not extend the statute of limitations indefinitely but merely suspends the running of the applicable statute of limitations for a finite . . . readily identifiable time period."  *Bermudez Chavez v. Occidental Chem. Corp.*, 35 N.Y.3d 492, 505 n. 8 (2020).  Where applicable, the period covered by a toll is excluded from the time after the claim accrued, effectively extending the deadline by which the plaintiff can timely commence an action.  *Id.*  Section 1983 claims are "subject to state 'tolling rules,'" and "both statutory and common law rules are to be borrowed" from state law.  *Pearl*, 296 F.3d at 81; *Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 2007); *but see Shin v. NBC Universal Media, LLC*, No. 23 Civ. 10996, 2025 WL 438297, at *8 (S.D.N.Y. Feb. 7, 2025) (state tolling rules are inapplicable where the limitations period expressly provided by a federal law, such as Title VII).

On March 20, 2020, then-Governor Cuomo signed into effect the Order in question, which tolled the time for commencing any legal action.  The Order—and ensuing extensions— tolled the limitations period from March 20, 2020 through November 3, 2020, a total of 228

---

*Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002); *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000) ("The crucial date is the date the complaint was filed.").

31

days. *See Bell v. Saunders*, No. 20 Civ. 256, 2022 WL 2064872, at *4–5 (N.D.N.Y. June 8, 2022). It provided:

> In accordance with the directive of the Chief Judge of the State to limit court operations to essential matters during the pendency of the COVID-19 health crisis, any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state, including but not limited to the criminal procedure law, the family court act, the civil practice law and rules, the court of claims act, the surrogate's court procedure act, and the uniform court acts, or by any other statute, local law, ordinance, order, rule, or regulation, or part thereof, is hereby tolled from the date of this executive order until April 19, 2020.

Exec. Order 202.8, N.Y. Comp. Codes R. & Regs. Tit. 9 § 8.202.8.[22]

Courts in this Circuit have uniformly applied the Order to toll claims brought under § 1983. *Miehle-Kellogg v. County of Suffolk*, No. 19 Civ. 4943, 2024 WL 5120017, at *10–11 (E.D.N.Y. Dec. 16, 2024); *Rich*, 2022 WL 992885, at *8 ("other courts in this district have uniformly concluded that [the Order] applies to federal cases applying New York's statute of limitations, including for § 1983 claims"). They have held that "the [Order] does not 'defeat the goals' of Section 1983," but "[r]ather advances the goals of 'deterrence and compensation' by permitting [a] [p]laintiff ample time to pursue [her] claims during a global pandemic." *Bonilla v. City of New York*, No. 20 Civ. 1704, 2020 WL 6637214, at *2 (E.D.N.Y. Nov. 12, 2020) (quoting *Abbas*, 480 F.3d at 641) (citations omitted). The New York Court of Appeals has similarly construed the Order to toll the applicable statute of limitations. *See Favourite Ltd. v. Cico*, 218 N.Y.S.3d 540, 548 (2024).

---

[22] The Order was extended multiple times, ultimately through November 3, 2020. *See* Order ("the suspension for civil cases in Executive Order 202.8, as modified and extended in subsequent Executive Orders, that tolled any specific time limit for the commencement, filing, or service of any legal action . . . as prescribed by the procedural laws of the state . . . is hereby no longer in effect as of November 4, 2020.").

The Order would likewise apply here, to the extent that plaintiffs' § 1983 claims accrued before the end date (November 3, 2020). It is no response to argue, as does the County, that, as of 2020, *Tyler* had not issued. Although property owners were surely less sensitized then to the viability of a Takings-Clause-based § 1983 claim, such claims were available to them, as they had been to Geraldine Tyler, who began the successful action to reclaim her foreclosure surplus in 2020. *Tyler v. Hennepin County*, No. 20 Civ. 889 (D. Minn. April 7, 2020), Dkt. 1. To the extent a claim by a plaintiff here accrued before the Executive Order, that plaintiff, under the Order's text, was entitled to the tolling of the 228-day period between March 20 and November 3, 2020. And to the extent a claim by a plaintiff here accrued during the pendency of the Executive Order, a property owner in the County, under the Order's text, would have been entitled to the tolling of the period between the accrual date and November 3, 2020.[23]

The Order, however, does not ultimately salvage the claim of any of the eight plaintiffs whose accrual dates preceded December 5, 2020.

For four of these plaintiffs, spanning three properties, their claims accrued, on November 23, 2020, after the end of the period covered by the Order.[24] The Order has no bearing on these

---

[23] Also unpersuasive is the County's argument that plaintiffs were untimely in first pursuing tolling under the Executive Order two years into this litigation. Cnty. Opp'n at 31–32. Tolling is not itself a claim or an affirmative defense. The County does not cite any authority supporting that plaintiffs were obliged to plead the applicability of a toll, or that, by not doing so in opposing defendant's motion to dismiss, plaintiffs waived the right to do so in opposing defendant's motion for summary judgment. *See Harte v. Ocwen Fin. Corp.*, No. 13 Civ. 5410, 2018 WL 1559766, at *14 n. 19 (E.D.N.Y. Mar. 30, 2018) (plaintiff did not waive right to oppose timeliness argument by failing to address it before summary judgment stage).

[24] These are: plaintiffs Olga Andreenko, Petr Andreenko, Jeremiah Meachum, and Steven Seitzman as principal of One Hundred Thirty Five Bowery, LLC. Olga and Petr Andreenko's property, identified at Tax Map No. 44.-1-47, Jeremiah Meachum's property, identified at SBL No. 26.-1-43, and One Hundred Thirty Five Bowery, LLC's property, identified at Tax Map No. 32.-2-8.2, were conveyed to third-party purchasers on November 23, 2020. Pls.' SMF ¶¶ 103, 110, 136, 143, 180, 187.

plaintiffs. Their claims are untimely because they filed suit on December 5, 2023, two weeks too late.

The other four plaintiffs' claims accrued even earlier—in July 2019.[25] Excluding the 228 days in 2020 covered by the Executive Order, the three-year limitations period for each of these plaintiffs ended in March 2023, some nine months before this suit was filed. Although plaintiffs initially contested the point, both sides now agree that these plaintiffs' § 1983 claims are untimely. *See* Pls.' Mem. at 28–30; Cnty. Mem. at 14–16.

In sum, 15 of the 23 plaintiffs' Takings Clause claims under § 1983 are timely. With the undisputed material facts establishing the elements of those claims, the Court will enter summary judgment for those 15 plaintiffs on those claims. The Court will enter summary judgment for the County on the untimely claims of the remaining eight plaintiffs.

## IV.    Plaintiffs' § 1983 Claims Based on the Excessive Fines Clause

Plaintiffs also bring § 1983 claims under the Eight Amendment's Excessive Fines Clause based on the County's retention of their foreclosure surpluses. Plaintiffs post-*Tyler* have often brought such claims alongside Takings Clause claims, with mixed success. *Compare Polizzi*, 720 F. Supp. 3d at 152 (claim plausibly pled) *and Sharritt v. Henry*, 2024 WL 4524501, *14–15 (N.D. Ill. Oct. 18, 2024) (same), *with Freed*, 81 F.4th at 659 (upholding grant of summary judgment to county defendant on Excessive Fines claim).

---

[25] These are: plaintiffs Gloria Cavaluzzi, Joel Needleman, Sherrie Needleman, and Sharon Seekamp. Gloria Cavaluzzi's property, identified at Tax Map No. 21.-2-6.1, was conveyed to a third-party purchaser on July 12, 2029. Pls.' SMF ¶¶ 26, 33. Joel and Sherrie Needleman's property, identified at Tax Map No. 58.C-2-16, was conveyed to a third-party purchaser on July 17, 2019. *Id.* ¶¶ 59, 66. Sharon Seekamp's property, identified at Tax Map No. 34.-2-2, was conveyed to a third-party purchaser on July 24, 2019. *Id.* ¶¶ 202, 209.

Here, however, there is no need for the Court to weigh in on the viability of an Excessive Fines claim based on such circumstances—an issue raised but unresolved in *Tyler*. *See* 598 U.S. at 648–50 (Gorsuch, J., concurring).

For the 15 plaintiffs whose § 1983 claims based on the Takings Clause have prevailed, no purpose would be served by resolving the claims based on the Excessive Fines Clause. These claims are factually coextensive with the Takings Clause claims and seek identical relief. And it is black-letter law that a plaintiff is not entitled to a double recovery for the same injury. *See, e.g.*, *Bender v. City of New York*, 78 F.3d 787, 793 (2d Cir. 1996) ("If two causes of action provide a legal theory for compensating one injury, only one recovery may be obtained."); *Cover v. Am. Postal Workers Union-AFL-CIO*, 357 F. App'x 336, 337 (2d Cir. 2009) (summary order); *Lo v. AT&T Servs., Inc.*, No. 17 Civ. 401, 2018 WL 587322, at *5 (D. Conn. Jan. 29, 2018) (same) (citing *Phelan v. Local 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting Indus.*, 973 F.2d 1050, 1063 (2d Cir. 1992)). The Court thus dismisses the Excessive Fines claims of these 15 plaintiffs, without prejudice to renewal in the event the judgments in these plaintiffs' favor on their Takings Clause claims are overturned. *See, e.g., Murray v. Feldesin*, No. 25 Civ. 733, 2025 WL 2618931, at *1 (N.D.N.Y. Sept. 11, 2025) (dismissing § 1983 claims under Eighth Amendment without prejudice where duplicative of other claims); *Madison v. Mazzuca*, No. 2 Civ. 10299, 2004 WL 3037730, at *10–11 (S.D.N.Y. Dec. 30, 2004) (same); *Lont v. Roberts*, No. 12 Civ. 4960, 2013 WL 1810759, at *3–4 (E.D.N.Y. Apr. 26, 2013) (dismissing § 1983 claims without prejudice where duplicative of other claims); *Wells v. Harper*, No. 25 Civ. 1535, 2026 WL 89965, at *1 (N.D.N.Y. Jan. 13, 2026) (same).

For the eight plaintiffs whose § 1983 claims based on the Takings Clause have been held untimely, the § 1983 claims based on the Excessive Fines Clause are also time-barred. The

35

limitations period applicable to these claims also borrows from the limitations period for state-law personal injury actions.  *See, e.g.*, *Sikorsky*, 136 F.4th at 62; *Kane*, 80 F.4th at 108; *Hogan*, 738 F.3d at 517.  That period is three years.  There is no basis to—and plaintiffs do not—argue that an Excessive Fines claim based on the County's retention of a foreclosure surplus would accrue any later than the date the County received and retained that surplus.  The Court thus enters summary judgment for the County on the Excessive Fines claims of these plaintiffs.  *See, e.g.*, *Watkins v. Ramos*, No. 14 Civ. 2748, 2015 WL 4503650, at *14 n. 6 (S.D.N.Y. July 23, 2015) ("Claims alleging violations of the Eighth Amendment under § 1983 are subject to a three-year statute of limitations, and thus this allegation is also untimely"); *Covington v. City of New York*, No. 98 Civ. 1285, 1999 WL 739910, at *6 (S.D.N.Y. Sept. 22, 1999) (same); *Beaman v. New York*, No. 25 Civ. 1402, 2026 WL 189446, at *1 (N.D.N.Y. Jan. 22, 2026).

## V.    Plaintiffs' Unjust Enrichment Claims

Plaintiffs also bring claims of unjust enrichment.  To establish such a claim under New York law, a plaintiff must prove that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered.  *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012) (cleaned up).  Such a claim "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff."  *Wheeler v. Topps Co., Inc.*, 652 F. Supp. 3d 426, 435 (S.D.N.Y. 2023) (cleaned up).

Plaintiffs' unjust enrichment claims are timely.  The limitations period for such claims turns on the substantive relief the plaintiff seeks.  *Loengard v. Santa Fe Indus., Inc.*, 70 N.Y.2d 262, 266 (1987).  In general, that period is six years for equitable relief, *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 518 (2d Cir. 2001) (citing N.Y. C.P.L.R. §§ 213(1), (7) (McKinney

1990)), and three years for monetary damages*, Ingrami v. Rovner*, 847 N.Y.S.2d 132, 134 (2d Dep't 2007); *Lia v. Saporito*, 909 F.Supp.2d 149, 167 (E.D.N.Y. 2012); *Grynberg v. Eni S.p.A.*, No. 6 Civ. 6495, 2007 WL 2584727, at *3 (S.D.N.Y. Sept. 5, 2007).

Plaintiffs here seek restitution, an equitable remedy because they do not wish "to impose personal liability on the defendant, but to restore to the plaintiff[s] particular funds or property in the defendant's possession." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002); Restatement (Third) of Restitution § 160, *Comment* a, at 641–42 (restitution remedy is "in equity" where plaintiffs have identified money belonging in good conscience to them traceable to funds in the defendant's possession); *see, e.g.*, *Pindell v. N'Namdi*, No. 20 Civ. 818, 2021 WL 9036271, at *9 (S.D.N.Y. June 8, 2021) (finding that plaintiff's unjust enrichment claim seeks "equitable relief, namely, restitution, which is not damages but is a restoration required to prevent unjust enrichment; thus, the statute of limitations is six years" (cleaned up)); *Chalmers v. Nat'l Collegiate Athletic Ass'n*, No. 24 Civ. 5008 (PAE), 2025 WL 1225168, at *17 (S.D.N.Y. Apr. 28, 2025) (same), *aff'd*, 2025 WL 3628416 (2d Cir. Dec. 15, 2025); *Danecker v. Bd. of Trs. of Serv. Emps. 32BJ N. Pension Fund*, 882 F. Supp. 2d 606, 615 (S.D.N.Y. 2012). The limitations period for plaintiffs' unjust enrichment claims is thus six years.

The Court, however, dismisses the unjust enrichment claims of all plaintiffs, as duplicative of the § 1983 claims based on the Takings Clause. Because the analysis differs, the Court first addresses the 15 plaintiffs whose § 1983 claims have prevailed, and then the eight whose § 1983 claims are untimely.

The 15 plaintiffs whose § 1983 claims were not time barred have prevailed on those claims and will recover in full from the County. These plaintiffs do not seek additional relief, and cannot claim that, absent further relief, the County has been unjustly enriched at their

37

expense.  Summary judgment on these plaintiffs' unjust enrichment claims must therefore be entered in the County's favor.  *See, e.g.*, *4Kids Ent., Inc. v. Upper Deck Co.*, 797 F. Supp. 2d 236, 249 (S.D.N.Y. 2011) (granting summary judgment for defendants on unjust enrichment claims that duplicated relief of claims on which plaintiffs had prevailed); *J. Kings Food Serv. Pros., Inc. v. Navin Bros. Food Serv., Inc.*, No. 17 Civ. 5472, 2018 WL 4443130, at *3 n. 3 (E.D.N.Y. Aug. 15, 2018) (same); *Solomatina v. Mikelic*, 370 F. Supp. 3d 420, 432 (S.D.N.Y. 2019).

The eight remaining plaintiffs have not prevailed on their § 1983 claims, but their unjust enrichment claims must be dismissed for a separate reason.  Where an "unjust enrichment claim is merely incidental to or duplicative of another claim with a shorter limitations period, the Court will not allow a plaintiff to avail [herself] of the longer limitations period."  *Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 667 (S.D.N.Y. 2007).  That is because the time-barred cause of action, under § 1983, furnished these plaintiffs an adequate remedy.  *Williams v. Trimble*, 527 F. Supp. 910, 911 (S.D.N.Y. 1981) ("Section 1983 affords a remedy for the deprivation of rights secured by the Constitution and laws."); *Malkan v. Mutua*, No. 12 Civ. 236, 2012 WL 4722688, at *10 (W.D.N.Y. Oct. 3, 2012) (same).  And "it is basic that equitable relief will not be granted where an adequate remedy at law exists."  *Nasdaq, Inc. v. Exch. Traded Managers Grp.*, 431 F. Supp. 3d 176, 274 (S.D.N.Y. 2019) (quoting *SCM Corp. v. Xerox Corp.*, 507 F.2d 358, 363 (2d Cir. 1974)); *Norris v. Grosvenor Mktg.*, 803 F.2d 1281, 1287 (2d Cir. 1986) ("An equitable claim cannot proceed where the plaintiff has had and let pass an adequate alternative remedy at law"); *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613–14 (2d Cir. 2010) (summary order).

It is no response that plaintiffs' § 1983 claims were dismissed as untimely, not for failure to establish a substantive element. Where "plaintiffs' other claims are defective, an unjust enrichment claim cannot remedy the defects." *Philip S. Schwartzman, Inc. v. Pliskin, Rubano, Baum & Vitulli*, 187 N.Y.S.3d 702, 706 (2d Dep't 2023) (cleaned up); *Corsello*, 18 N.Y.3d at 791; *Silva v. Smucker Nat. Foods, Inc.*, No. 14 Civ. 6154, 2015 WL 5360022, at *12 (E.D.N.Y. Sept. 14, 2015) ("the fact that unjust enrichment has a long statute of limitations than [plaintiff's] other claims is a thin reed upon which to find it non-duplicative").

That the elements of a § 1983 claim are not coterminous with those of an unjust enrichment claim is also of no moment. *See* Pls.' Mem. at 15–17. Whether an unjust enrichment claim duplicates another does not turn on whether the elements are coextensive. A court must "compar[e] the factual basis for the claims," rather than make "a formulaic, element-to-element comparison between two causes of action." *Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 117 (S.D.N.Y. 2021); *Nachman v. Tesla*, 2023 WL 6385772, at *5 (E.D.N.Y. Sept. 30, 2023), *aff'd*, 2025 WL 1201996 (2d Cir. Apr. 25, 2025) (summary order). Where the same conduct underpins the claims, they are duplicative. *See, e.g.*, *31 Alanson Lane, LLC, v. Town of Southampton*, No. 23 Civ. 8938, 2026 WL 414716, at *12 (E.D.N.Y. Feb. 15, 2026) (finding unjust enrichment claim "entirely duplicative" of plaintiffs' § 1983 Takings Clause claims); *Leder v. Am. Traffic Sols., Inc.*, 81 F. Supp. 3d 211, 227 (E.D.N.Y.) ("Plaintiff's claim for unjust enrichment is duplicative of her § 1983 substantive Due Process claim."), *aff'd*, 630 F. App'x 61 (2d Cir. 2015) (summary order); *Casey v. Odwalla*, Inc., 338 F. Supp. 3d 284, 299 (S.D.N.Y. 2018) (dismissing unjust enrichment claim when it arose from identical facts as other claims); *Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 296–97 (S.D.N.Y. 2015); *Buonasera v.*

*Honest Co.*, 208 F. Supp. 3d 555, 567–68 (S.D.N.Y. 2016); *Wedra v. Cree, Inc.*, No. 19 Civ. 3162, 2020 WL 1322887, at *11 (S.D.N.Y. Mar. 20, 2020).

That claims are duplicative is all the more apparent where the two claims seek the same relief. *See, e.g.*, *In re 305 E. 61st St. Grp. LLC*, 130 F.4th 272, 282 (2d Cir. 2025) ("Two claims are duplicative of one another if they . . . do not allege distinct damages.") (cleaned up); *Cooper*, 553 F. Supp. 3d at 115 (dismissing unjust enrichment claim as duplicative where it did not allege "distinct damages" (clean up)); *Bermudez v. Colgate-Palmolive Co.*, 667 F. Supp. 3d 24, 45 (S.D.N.Y. 2023) (same); *Koenigsberg v. Bd. of Trs. of Columbia Univ.*, 2025 WL 1540252, at *3 (2d Cir. May 30, 2025) (summary order). *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 290–91 (S.D.N.Y. 2014) (same).

The Court accordingly grants summary judgment to the County on all unjust enrichment claims.

## VI.    Damages Inquiry on the Prevailing Plaintiffs' § 1983 Claims

The parties' submissions on summary judgment focused overwhelmingly on issues of liability. As to damages, the parties stipulated to the accuracy of a document entitled the "Gains Report." Dkt. 112-3 at 19–20 ("Gains Report"); *see, e.g.*, Pls' SMF ¶ 25 ("[t]he numbers contained in the Gains Report are accurate"). Prepared by the County, it reflects, for each property underlying plaintiffs' claims, the difference between (1) the price for which the County sold the property at auction and (2) all moneys the plaintiff owed to the County (inclusive of any additional fees, penalties, and interest allowed by law). *Id.* The Gain Report labels that figure as "Gain." *See id.*; *see also* Pls.' SMF ¶¶ 24–25.[26]

---

[26] The Gains Report defines "Gain" as the difference between the "Bid Amount" and the sum of the buyers premium, $20 fee, clerk fees, advertising fees, outstanding taxes, search fee, and interest. *See* Gains Report. As part of the parties' JSF, the County stipulated to the Gains

40

The parties disagree, therefore, not over any material facts—but methodology. Plaintiffs contend that "Gain" reflects the surplus equity due to them on their Takings Clause claims. Pls.' Mem. at 15. The County, however, contends that—to arrive at "surplus equity"— a further deduction must be made.[27] Notwithstanding its pre-briefing stipulation that the Gains Report accurately reflected the sales price of the property and the sums due to the County from it, *see* JSF ¶¶ III. 7–9, 16–18, 28–30, the County's summary judgment brief contends that "liens, judgments, and other encumbrances" must be subtracted from the gain figure. Cnty. Opp'n at 14. This, it states, would yield a negative number in some circumstances and, thus, no taking and no surplus due to plaintiffs. *Id.*

The County's methodology clearly appears misbegotten, both because it would entail twice deducting "liens, judgments, and other encumbrances" from the sales price, and because it misapprehends the operation of the RPTL. Under Article 11, all liens and encumbrances on the property expire after adequate notice is provided to all "persons owning or having or claiming to have an interest in the real property." RPTL § 1124 (McKinney 2023). That process occurs *before* foreclosure. *Id.* § 1125. After the ensuing sale of the property at auction, the County distributes the sales proceeds to all recognized lien-holders, including the tax-lienholder, up the amount of their lien. The surplus (net of allowable fees, penalties, and interest) belongs, under *Tyler*, to the property holder. *See id.* § 1196(1)(a)(i) (a surplus may be determined by taking the "sum of the total amount of taxes due plus interest, penalties and other charges" and subtracting

---

Report's calculations to determine the "difference between the amount of the sale" of a plaintiff's property and "the amount [she] owed the County." *See, e.g.* JSF ¶¶ II.9, 18, 29.

[27] The County does not dispute the accuracy of the Gains Report or its contents. Pls.' SMF ¶¶ 24–25. It contends that the Gains Report "does not include all judgment and liens against subject properties at the time of foreclosure. Thus, any surplus, net, or gain calculated is not accurate for purposes of determining true surplus equity." *Id.*

"the amount paid for the property."). The County's treasurer testified, in fact, that that process was used in connection with the foreclosure sales, at issue here, save that the County retained the surplus, rather than remitting it to the property owner. *See* Buck Tr. at 130–31.

Nonetheless, in the interest of assuring an accurate damages calculation, the Court—barring an agreement as to the damages due to the 15 prevailing plaintiffs—will commission briefing on this discrete point. Such will give the County an opportunity to defend its proposed methodology. An order setting out an expedited briefing schedule and identifying the issues to be addressed will issue shortly.

## CONCLUSION

For the reasons set forth above, the Court finds as follows:

1. ***Takings Clause claims***: As to 15 plaintiffs,[28] the Court grants their motion for summary judgment as to liability on their § 1983 claims based on the Takings Clause and denies the County's cross-motion on such claims. As to the remaining eight plaintiffs,[29] the Court grants the County's motion for summary judgment on these claims, because they are untimely.

2. ***Excessive Fines Clause claims***: The Court dismisses without prejudice the § 1983 claims based on the Excessive Fines Clause of the 15 plaintiffs whose Takings Clause claims have prevailed. As to the remaining eight plaintiffs, the Court grants the County's motion for

---

[28] These are: plaintiffs Lyndon Alleyne, Caterina Coviello, Pasquale Coviello, Roseanne Crumbley, Lisa DeMarinis, Harvey Edelgass, Lawrence Eisenberg, Steven Eisenberg, Kenny Emeigh, Louise Gorr, Richard Gorr, Tatiana Kozak, Thomas Prendergast, Joseph Szymczak as principal of Madlill Properties Corporation, and Amber Tsoucalas as Executrix of the Estate of Everett Tsoucalas.

[29] These are: Olga Andreenko, Petr Andreenko, Gloria Cavaluzzi, Jeremiah Meachum, Joel Needleman, Sherrie Needleman, Sharon Seekamp, and Steven Seitzman as principal of One Hundred Thirty Five Bowery, LLC.

summary judgment on these claims, because these claims are untimely.

3. *Unjust enrichment claims*: As to all plaintiffs, the Court grants the County's motion for summary judgment, because these claims are duplicative of plaintiffs' § 1983 claims based on the Takings Clause.

The Court denies all summary judgment motions not addressed in the three paragraphs above. The Clerk of Court is respectfully directed to terminate the motions pending at dockets 108 and 112.

An order will issue shortly setting a briefing schedule with respect to damages due to the prevailing plaintiffs.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: March 6, 2026
       New York, New York